T.C. Memo. 1997-475

UNITED STATES TAX COURT

S.K. JOHNSTON, III AND JULIE N. BOYLE, F.K.A.
JULIE N. JOHNSTON, ET AL.,[1] Petitioners <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 16668-94, 16669-94,   Filed October 20, 1997.
16670-94.

<u>C. Christopher Trower</u>, <u>Reginald J. Clark</u>, and <u>W. Scott
Wright</u>, for petitioners.

<u>Bonnie L. Cameron</u>, for respondent.

MEMORANDUM OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in,
additions to, and a penalty on petitioners' Federal income tax as
follows:

---

[1]    By order of this Court dated Dec. 11, 1995, cases of the
following petitioners were consolidated herewith for purposes of
trial, briefing, and opinion:  S.K. Johnston, Jr., docket No.
16669-94; S.K. Johnston, Jr., and Gillian S. Johnston, docket No.
16670-94.

S.K. Johnston III and Julie N. Boyle, f.k.a., Julie N. Johnston,

docket No. 16668-94[2]:

| Year | Deficiency | Additions to Tax Sec. 6661 |
|------|------------|----------------------------|
| 1987 | $15,877.43 | $4,969.00 |
| 1988 | 16,890.08 | 4,223.00 |
| 1989 | 12,026.80 | - |

S.K. Johnston, Jr., docket No. 16669-94:

| Year | Deficiency | Additions to Tax Sec. 6653(a)(1) | Sec. 6661 |
|------|------------|----------------------------------|-----------|
| 1988 | $174,164.19 | $8,708.21 | $43,609.00 |

S.K. Johnston, Jr., and Gillian S. Johnston, docket No. 16670-94:

| Year | Deficiency | Additions to Tax and Penalty Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 | Sec. 6662 |
|------|-----------|--------------------|--------------------|-----------|-----------|
| 1987 | $222,349.65 | $11,117.48 | * | $55,587.00 | - |
| 1989 | 312,431.41 | - | - | - | $62,486.28 |

* 50 percent of the interest due on $21,235.83.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

---

[2] The only issue that involves S.K. Johnston III and Julie N. Boyle, f.k.a. Julie N. Johnston is whether Bendabout Polo Sales and Management Co. (BPS) was an activity engaged in for profit. BPS, a partnership owned 75 percent by S.K. Johnston, Jr. and 25 percent by his son, S.K. Johnston III began operations on June 1, 1986, as a polo horse sales business.

After concessions by the parties, the issues for decision are: (1) Whether petitioners'[3] farming activity known as Bendabout Farm was an activity engaged in for profit under section 183 during the taxable years in issue. We hold it was. (2) Whether petitioners' ranching activity known as Flying H Ranch was an activity engaged in for profit under section 183 during the taxable years in issue. We hold it was. (3) Whether petitioners' horse sales activity operated through a partnership known as Bendabout Polo Sales and Management was an activity engaged in for profit under section 183 during the taxable years in issue. We hold it was. (4) Whether Gillian Johnston's horse training activity known as GJ Stables, conducted at Bendabout Farm, was an activity engaged in for profit under section 183 during the taxable years in issue. We hold it was. (5) Whether $1,131,438 was the fair market value of a conservation easement, encumbering the Flying H Ranch donated by petitioners to the Nature Conservancy during 1989. We hold it was.[4]

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference.

---

[3] Hereinafter, the term "petitioners" refers to S.K. Johnston, Jr. and Gillian Johnston, unless discussing BPS, where the term petitioners refers to S.K. Johnston, Jr. and Gillian Johnston and S.K. Johnston III and Julie N. Boyle, f.k.a. Julie N. Johnston.

[4] Due to our holding for petitioners on all five issues, we need not address whether petitioners are liable for additions to tax or accuracy-related penalties.

At the time of filing the petition in their case, petitioners S.K. Johnston III (S.K. Johnston) and Julie N. Boyle, f.k.a. Julie N. Johnston (Julie Boyle), resided in Atlanta, Georgia, and Camden, South Carolina, respectively.[5] At the time of filing the petition in his case, S.K. Johnston, Jr. (petitioner), resided in Atlanta, Georgia. At the time of filing the petition in their case, Gillian S. Johnston (Gillian Johnston) and petitioner (collectively the Johnstons) resided in McDonald, Tennessee, and Atlanta, Georgia, respectively.[6] For convenience, we present a general background section and combine our findings of fact with our opinion under each separate issue.

General Background

Petitioners' Activities

There are four activities at issue in the instant case, which are conducted in three primary locations. The first activity is Bendabout Farm (Bendabout or the farm), which is located approximately 10 miles east of Chattanooga, Tennessee. The second activity is Flying H Ranch (Flying H or the ranch), which is located on the eastern slope of the Bighorn Mountains in north-central Wyoming near the Montana border. The third activity is Bendabout Polo Sales and Management Co. (BPS), conducted by a partnership of which petitioner owns 75 percent,

_____

[5] S.K. Johnston and Julie Boyle were married and filed joint returns for 1987, 1988, and 1989.

[6] Petitioner and Gillian Johnston filed joint returns for 1987 and 1989, and separate returns for 1988.

and S.K. Johnston, his son, owns 25 percent. The sales aspect of BPS was primarily conducted in southern Florida, while the polo pony training operations were conducted at Bendabout in Tennessee and Flying H in Wyoming. The fourth activity is GJ Stables (GJ or the stables), a steeplechase horse training business conducted by Gillian Johnston on 35 acres located at Bendabout.

The parties have stipulated that petitioners carried on each of these four activities in a businesslike manner and maintained complete and accurate books and records. With respect to all four activities, the parties further stipulated that none of the expenses in issue constitute personal living, or family expenses, and that each activity keeps adequate accounting records separating business from personal expenses, including gas and utilities.

### Petitioner

At the time of trial, petitioner was 62 years of age and resided in Atlanta, Georgia. He has lived at Bendabout his entire life, including the years in issue. Petitioner is married to Gillian Johnston and they have five children. During the years in issue, two of the children were minors who lived with them at Bendabout. Bendabout has been in the Johnston family since the 1830's. Petitioner inherited the farm from his father in 1985.

Petitioner is a successful business executive. He currently serves as the president and chief operating officer of publicly

held Coca-Cola Enterprises, Inc. Petitioner and his family started and controlled the Johnston Coca-Cola Bottling Co. (Johnston Coca-Cola) which operated bottling plants in Cleveland, Tennessee, and other parts of the country. Petitioner has been successful in operating Johnston Coca-Cola.

### Gillian Johnston

At the time of trial, Gillian Johnston was 54 years of age. She grew up in England where she made her living training and racing steeplechase horses. After completing her studies and prior to marrying petitioner, she came to the United States, where she trained steeplechase horses for a living. Since 1964, she has been licensed by the State of New York as a steeplechase horse trainer. During the years at issue, Gillian Johnston operated a steeplechase training and racing activity known as GJ Stables out of a converted cow barn and pasture on approximately 35 acres at Bendabout.

### Dr. Ronald Haaland

Dr. Ronald Haaland (Dr. Haaland) is an agricultural scientist who taught soil sciences at Auburn University for 6 years and has been consulting and working in the agricultural industry for more than 20 years. In 1987, petitioner hired Dr. Haaland to develop a complete management plan for both Bendabout and Flying H.

Dr. Haaland lived at Bendabout for approximately 2 years during the years at issue, working closely with petitioner and

the farm's staff to develop a business plan for the farm. Petitioner regularly interacted with Dr. Haaland on the Bendabout business plans and has followed Dr. Haaland's recommendations.

In 1990, after submitting numerous drafts to petitioner and following several years of on-site work, Dr. Haaland completed the business plan for Bendabout. The purpose of the plan was to refine objectives and strategies to improve the income potential of the farm. It analyzed the horse boarding operation, described the businesslike manner in which the operation was then being conducted, and concluded that more aggressive marketing should be implemented to increase the projected profit by 10 percent per year.

During the years in issue, Dr. Haaland traveled frequently to Flying H. He spent time there during the various seasons in an effort to appreciate the property's multi-seasonal use potential. Dr. Haaland and Archie MacCarty (MacCarty), the manager of Flying H worked closely to develop a business plan for the ranch.

Issue 1. Whether Petitioners' Farming Activity Known as Bendabout Farm was an Activity Engaged in For Profit

Bendabout Farm

During the years in issue Bendabout Farm consisted of approximately 2,000 acres, most of which was utilized as follows:

| | |
|---|---|
| Alfalfa/rye | 32 acres |
| Corn | 62 acres |
| Cattle | 215 acres |
| Horse boarding | 191 acres |

             GJ Stables/steeplechase              35 acres
             Horse breeding/thoroughbred          86 acres
             Woods and roads                   1,022 acres

In the early 1980's, petitioner began taking over the farm operations from his father, who died in 1985.  Petitioner, who grew up around horses and followed the horse breeding industry, has acquired knowledge about horse activities, including thoroughbred breeding.

From the early to mid-1980's, the thoroughbred industry was healthy, growing, and considered to be a good investment among professionals in that field.  Given the robustness of the thoroughbred industry, petitioner thought that operating a thoroughbred breeding business at Bendabout could be very lucrative.  Under the management of petitioner's father, Bendabout had been used to range cattle.  Petitioner, however, believed that the pastures, barns, and other physical facilities at Bendabout could be used most efficiently for thoroughbred breeding and boarding operations, and that using the farm's facilities primarily for such operations would be more profitable than the cattle operations.

It takes a number of years to build a viable horse breeding operation.  The parties agree that the minimum startup period in the thoroughbred breeding business is 7 years.  It takes at least 2 years from the time of purchasing a mare to realize any income from the investment, because there is an 11-month gestation period, and it takes another year to raise the foal to a

yearling, which is the most profitable time to sell the horse. If the mare loses her foal, or is barren, there will be no income for an even longer period.

During the years in issue, petitioner started a program of acquiring brood mares and stallions for Bendabout's thoroughbred activity. He used approximately 86 acres of the farm for this purpose. The thoroughbred operation was concentrated in the northwestern section of the farm and consisted of approximately six or seven pastures, barns, and a training track. In 1987 and 1988, Bendabout generated stud fees from its stallions of $12,721 and $9,500, respectively.

From approximately 1985 through 1990, the outset of Bendabout's thoroughbred breeding program, the farm suffered substantial losses. Many of its brood mares aborted, had low fertility, and lost milk. The foals of brood mares that failed to produce milk were put on nurse mares brought in from Kentucky, which are very expensive to lease and the foals often do not feed as well on their milk. These problems plagued Bendabout for the first years of it foaling program. Neither petitioner nor his farmhands could determine the cause of the problem. In response, Bendabout changed its operation leaving its brood mares in Kentucky to foal after purchasing them. This was an expensive change, however, because the farm incurred costs to board the mares in Kentucky and then to transport them back to Tennessee.

When petitioner discovered that horse farms all over Kentucky and Tennessee were experiencing similar problems, he consulted with Dr. Haaland, a leading agribusiness specialist and expert in grass technology. After analyzing grass samples from Bendabout's pasture, Dr. Haaland determined that the grass was contaminated with a toxic fungus, which was causing the mares' reproduction problems. Dr. Haaland recommended that Bendabout replant its pastures if it intended to maintain its breeding program. Sometime prior to 1990, Bendabout incurred substantial expenses in land preparation and seed costs replanting 45 acres of pasture. During this time, Tennessee entered into a severe 4-year drought period which devastated much of the farm industry in the southeast. As a result, the first two or three attempts to reestablish the pastures failed. Finally, after the pastures had been replanted, Bendabout purchased seven well-bred and conformed mares to enhance the breeding business.

The farm's thoroughbred program faced further difficulties stemming from problems in the industry itself. In 1986, there was a drastic drop in the average and median prices for yearlings. Starting in approximately 1988 through 1995, many of the historically very successful and well-known horse breeding farms filed for bankruptcy. After a history of losses, Bendabout liquidated its thoroughbred breeding program in 1993.

Another part of petitioner's business plan for Bendabout was to convert some of the cattle business to a more profitable polo

pony boarding program. As a longtime amateur polo player and past president and chairman of the U.S. Polo Association, petitioner had developed many polo contacts from all over the world. Petitioner knew that polo players board their horses every few months. Typically, a horse can play polo for about 3 months, and then it will need about 6 to 10 weeks to recuperate. Many international players play polo in Florida during the winter months and board their horses in the United States for the rest of the year, because it is too expensive to ship the horses back to their home countries. Petitioner believed that Bendabout was well-suited for boarding polo ponies, because it was located between Florida and the other States where polo is played regularly. Bendabout has boarded up to 300 horses during the course of a year. During the years in issue, Bendabout used approximately 190 acres to board horses owned by third parties on a daily fee basis. Polo players from as far away as Nigeria, England, Argentina, and Germany boarded their horses at the farm. For 1987, 1988, and 1989 revenues from boarding third party horses at Bendabout were $164,365, $169,500, and $185,000, respectively. Additional income from vanning, shoeing, and related services generated between $25,000 and $35,000 in revenues each year. Although the polo boarding program generated substantial revenues during the years in issue, the activity was hindered by severe droughts, which curtailed the farm's grazing potential and limited the number of polo horses that could be

boarded at any given time.  Bendabout also lost one of its best clients, whose polo career ended when he was shot.

Another part of petitioner's business plan for Bendabout was to develop the wooded areas of the farm for a wildlife habitat in order to generate revenue from hunting, fishing, and recreational use.  Dove hunting, deer hunting, and quail hunting were all available at Bendabout during the years in issue.  Food patches for quail were planted throughout the woods.  Several open fields were planted with species that benefit both dove and quail. Bendabout had approximately 4 acres of water, including Woods Lake, Boone Lake, Barn Lake, and Silo Pond which were available for fishing during the years in issue.

Discussion

Respondent determined that the Johnstons did not engage in their farm activity with the intent to earn a profit, and therefore pursuant to section 183 disallowed the related Schedule F losses for the years in issue.  Petitioners assert that they entered into and carried on Bendabout with the intent to earn a profit, and therefore their losses are allowable.

Section 183(a) provides that if an activity is not engaged in for profit, "no deduction attributable to such activity shall be allowed", except as otherwise provided in section 183(b).[7]

---

[7] Sec. 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed, such as interest and State and local taxes.  Sec. 183(b)(2) provides that deductions which would be

(continued...)

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The test for determining whether an individual is carrying on a trade or business under section 183 is whether the taxpayer's actual and honest objective in engaging in the activity is to make a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. While a taxpayer's expectation of profit need not be reasonable, there must be a good faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); sec. 1.183-2(a), Income Tax Regs.

To determine whether the requisite profit objective exists, we examine a variety of objective facts. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs. Thus, the determination of whether the requisite profit objective exists depends upon all the surrounding facts and circumstances of the case. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. The burden of proving the requisite profit objective is on the taxpayer. Rule 142(a); Allen v. Commissioner, supra at 34.

---

7(...continued)
allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)."

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit.  These factors include: (1) The manner in which the taxpayers carried on the activity; (2) the expertise of the taxpayers or their advisers; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayers in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayers; and (9) any elements indicating personal pleasure or recreation.  Although these factors are helpful in ascertaining a taxpayer's objective in engaging in the activity, no single factor, nor the existence of even a majority of the factors, is controlling; rather, the facts and circumstances of the case remain the primary test.  Keanini v. Commissioner, supra at 47.

Respondent argues that the Johnstons were not engaged in their farm activity with an intent to make a profit.  To support this contention respondent relies on Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), and section 1.183-2(b)(6), Income Tax Regs. for the proposition that losses which continue to occur beyond the formative years, if not explained, may indicate that an activity is not engaged in for

profit.  From 1982 through 1992, Bendabout showed a profit only in 1986, and that was due to a depreciation recapture adjustment. Respondent notes that each year since 1986, Bendabout generated roughly the same amount of income, while its expenses more than doubled from 1986 to 1992.  Moreover, respondent contends that petitioners will never recoup their losses, because Bendabout liquidated its thoroughbred operation in 1993.

Respondent's reliance on Bessenyey v. Commissioner is misplaced.  Petitioners' losses were incurred during the formative years of Bendabout's operation and were due to unforeseen events which were beyond petitioners' control.  On brief, respondent conceded that 7 years is the minimum startup period for this thoroughbred breeding business; it takes at least 2 years from the time of purchasing a mare to realize any income on the investment and if the mare loses the first foal, or is barren, petitioners will not generate any income for an even longer period.  Petitioners inherited Bendabout in 1985, and they started a program of acquiring brood mares and stallions for Bendabout's thoroughbred program during the years in issue. Thus, the losses were incurred during the startup period of petitioners' activity.  See Enghdahl v. Commissioner, 72 T.C. supra at 669.

More importantly, losses sustained because of unforeseen or fortuitous circumstances beyond petitioners' control do not indicate that the activity was not engaged in for profit.

Engdahl v. Commissioner, supra at 669.  From approximately 1985 through 1990, Bendabout suffered unforeseen losses resulting from a high rate of abortion in its brood mares, which occurred because the pastures on which they were grazing were contaminated with a toxic fungus.  Respondent argues, however, that after petitioners replaced 45 acres of pasture land at a substantial cost they abandoned the thoroughbred program.  Respondent contends that discontinuing an activity after expending large sums to improve its productivity does not support a profit objective.

Respondent fails to mention, however, that petitioners replanted the pastures prior to 1990, and they did not liquidate their horse breeding program until 1993.  In fact, on brief, respondent conceded that after petitioners had replanted the pastures, Bendabout purchased several well-bred mares to enhance its thoroughbred business.  Furthermore, respondent ignores the harsh reality of Mother Nature.  During the years in issue, the entire southeast entered into a severe 4-year drought.  As a result, Bendabout's first two or three efforts in reestablishing the pastures were unsuccessful, exacerbating petitioners' losses.  Respondent further ignores the changes that occurred in the market during this time. Robert Hill (Hill), petitioners' expert witness in the thoroughbred industry, credibly testified that the late 1980's brought a drastic drop in the average and median prices for yearlings.  He noted, however, that this price decline

was somewhat camouflaged by the polarization of the thoroughbred industry due to the fact that the upper-end of the market was controlled by Middle Eastern oil sheiks, who continued to pay top dollar for yearlings. In the late 1980's, when the sheiks' demand for thoroughbreds declined, the yearling prices plummeted. As a result, both newcomers and old-line professional thoroughbred farmers were faced with substantial losses. In fact, it was during this time that many of the historically well-known and successful horse breeding farms went bankrupt.

Respondent further argues that the Johnstons received personal pleasure and recreational benefits from operating Bendabout, which is persuasive evidence that the activity was not engaged in for profit. Respondent notes that during the years in issue the Johnstons lived on the farm, and petitioner spent time there hunting and fishing. Moreover, respondent focuses on the fact that during the years in issue petitioner held a dove hunt and fish fry at Bendabout to entertain his Coca-Cola colleagues. We note, however, that the parties stipulated that none of the losses claimed by petitioners with respect to their farm activity constituted personal, living, or family expenses. Moreover, at trial petitioner credibly testified that he paid for the cost of the annual dove hunt and fish fry out of his pocket.

Respondent contends that because of petitioners' financial status the losses from Bendabout actually generated a tax benefit. Given petitioner's substantial other income, it is true

that the Johnstons could easily afford to operate the farm activity at a loss. This fact alone, however, is not overly persuasive, because "As long as tax rates are less than 100 percent, there is no 'benefit' in losing money." Engdahl v. Commissioner, 72 T.C. at 670.

Finally, the following factors are indicative of a profit motive. The parties stipulated that petitioners conducted their farm activity in a businesslike manner, maintained accurate books and records, hired expert advisers, employed competent farmhands, and had personal experience in the activity in question. The parties further stipulated that Gillian Johnston regularly performed hard manual and menial labor at Bendabout, including feeding and grooming horses, mucking out stalls, and cleaning barns.

Respondent further concedes that petitioners responded to setbacks at the farm and tried to make corrective changes in its overall operations, including changing management two or three times and trying to increase the value of Bendabout's brood mares by breeding them to good pedigreed stallions in New York and Kentucky, such as D'Accord and Java Gold, both of which had good stud records.

Moreover, a taxpayer's regular experimentation with new sources of revenue is further evidence of a profit motive. Hoyle v. Commissioner, T.C. Memo. 1994-592. Here, petitioners continued to seek out the most profitable uses for the farm,

including boarding polo ponies, which brought in substantial revenues, and developing the wildlife habitat in an effort to generate revenue from hunting, fishing, and recreational use.

Thus, viewing the record as a whole, we hold that the Johnstons engaged in their farm activity with a bona fide intent to make a profit. Accordingly, the losses incurred in such activity during the years in issue are fully deductible.

Issue 2. Whether Petitioners' Ranching Activity Known as Flying H Ranch Was an Activity Engaged in For Profit

Flying H Ranch

In December 1985 petitioner acquired a 1,381-acre tract of rangeland, known as the Flying H Ranch, located on the eastern slope of the Bighorn Mountains near Sheridan, Wyoming, in north-central Wyoming, close to the Montana border. Subsequent purchases of 2,367 acres in December 1986, 925 acres in April 1989, and 3,902 acres in October 1989 increased Flying H to 8,575 acres, its size during the years in issue. The ranch property is rural rangeland, which is located approximately 5 miles from the Bighorn Equestrian Center, and approximately 250 miles from the Flying D Ranch, owned by Ted Turner, which is considered to be in the same general area by those traveling out west to hunt. Flying H is a multi-use activity.

Petitioner hired MacCarty, a well-respected and qualified rancher, to manage Flying H, and Dr. Haaland, an agribusiness

expert, as an adviser.  Dr. Haaland's primary responsibility was to devise a more profitable business plan for Flying H.

At the time of acquiring Flying H, petitioner believed that he would be able to put together a profitable cattle operation through better management of the land.  When petitioner acquired Flying H, his initial herd of cattle was 20 head of longhorn. Later, when petitioner and his advisers realized that the longhorn were not profitable, they decided not to expand that aspect of the ranching operation.  To cut losses, they put the longhorn to work as lead cattle.

During 1986 and 1987, Flying H continued to run cattle under rate-of-gain contracts, as it had done under previous owners. Under rate-of-gain contracts, the ranch does not buy cows or calves; rather, it allows the calves of others to graze on the ranch for a fee computed on the basis of how much weight the calves gain.  These contracts were less profitable than petitioner had expected and resulted in overgrazing.

In 1987, petitioner employed Dr. Haaland to analyze the ranch operations in an effort to improve its profitability. After examining the ranch, Dr. Haaland found that the pastures had been overgrazed and that the facilities were in disrepair. Dr. Halland's initial plan for Flying H was to reduce grazing and rebuild the ranch's infrastructure, such as the fences, buildings, and irrigation systems.  In order to let the pastures recover, grazing had to be limited for a short while.  With this

plan, however, in the long term Flying H would be able to run more cows and, therefore, make more money.  To assist this process, Dr. Haaland recommended that petitioner directly manage the ranch rather than allow the rate-of-gain contracts to continue.  He concluded that through direct management petitioner could correct the condition of the land and make it more productive.

Thereafter, petitioner attempted to develop Flying H as a typical western cattle ranch.  In 1988, Flying H initiated a yearling grazing stocker program.[8]  Consistent with its plan to reestablish its pasture, the ranch ran only 305 and 393 head of cattle in 1988 and 1989, respectively.  As the pastures improved, the ranch increased the number of cattle it grazed to 780 head in 1990, 1,256 in 1991, 1,447 in 1992, and 1,971 in 1993.  The location of Flying H is an excellent habitat for elk, deer, antelope, and other species of American wild game.  Petitioner recognized that the ranch presented a lucrative opportunity to offer big game hunting, because demand for hunting was increasing and hunters were willing to pay substantial fees to hunt big game.  For instance, other ranches in the same general area charged as much as $9,000 for an elk hunt.

---

[8]  In a "stocker" program, yearling cattle are purchased each spring from a cow-calf operation, fattened over the summer, and then resold in the fall.  In a cow-calf operation, the ranch owns the cows that it breeds.

Petitioner is actively involved in examining the annual business plans for Flying H. During the years in issue, petitioner's business manager would review the financial results of the operation in detail with MacCarty, working up budgets and plans, which petitioner studied and either approved or amended.

Respondent concedes that Flying H is not an over-improved property. The main ranch house was on the property when petitioner purchased it. Respondent further concedes that the facilities at Flying H are not extravagant or showy, but are rather ordinary and functional, just like any other working western ranch.

Discussion

As evidence of a lack of profit motive, respondent focuses on Flying H's history of losses, petitioners' use of such losses to offset other income, and the pleasure aspect of the activity. As discussed above, these factors alone do not negate a finding that petitioners engaged in their ranch activity with an intent to make a profit, especially given that the years in issue fall within the startup period of the activity. See Trafficante v. Commissioner, T.C. Memo. 1990-353 (a series of losses during the initial stages of an activity does not necessarily indicate that the activity was not engaged in for profit).

The parties have stipulated that petitioners carried on their ranching activity in a businesslike manner and maintained complete and accurate records. Moreover, respondent concedes

that petitioner believed he would be able to put together a profitable operation through better management of the land. Petitioner's testimony and demeanor, combined with other evidence, convince us that petitioners had an actual and honest objective of making a profit in conducting their ranch activity.

During the years in issue petitioner hired Dr. Haaland, an agricultural consultant, who evaluated the ranch's operations and developed a complete business plan for the ranch. See Hoyle v. Commissioner, T.C. Memo. 1994-592 (proof of detailed business plans and projections are evidence of a profit motive). Respondent concedes that Dr. Haaland is an expert in his field, and that MacCarty, a well-respected and qualified rancher managed Flying H during the years in issue. Respondent further concedes that petitioner never expressed to MacCarty that he did not care whether the ranch was profitable, and neither petitioner nor his business managers ever suggested a method of operation to MacCarty that was inconsistent with a profit objective. Furthermore, part of MacCarty's compensation was based on whether the ranch operations came in under budget, and he had a commission arrangement for cattle sold.

Respondent concedes that petitioner was actively involved in reviewing the business plans and annual budgets for Flying H, and that he spent substantial time at the ranch talking with MacCarty about options for the ranch's most productive use. Petitioner

carefully reviewed monthly reports and held his managers accountable for variances from the business plan and budget

A change of operating methods, adoption of new techniques, or abandonment of unprofitable methods is further evidence of petitioners' profit motive.  Eldridge v. Commissioner, T.C. Memo. 1995-384; sec. 1.183-2(b)(1), Income Tax Regs.  Here, petitioner implemented numerous changes in operation to try to improve profitability.

When petitioner acquired Flying H, he began his operation with 20 longhorn cattle.  Thereafter, he and his advisers determined that the longhorn were not profitable and decided not to expand that aspect of the business.  Moreover, in an effort to cut losses, they put the longhorn to work as lead cattle.

In 1987, Dr. Haaland determined that operating under rate-of-gain contracts was ruining the pastures' potential for long-term profits and recommended that petitioner take over the direct management of the ranch.  Petitioner, following Dr. Haaland's advice, cut back on grazing, which gave the pastures a chance to recover.  In the short-term, however, this meant that Flying H was not operating at its maximum cattle capacity, and therefore it was not maximizing its short-term earning potential.

In 1993, after running a stocker operation for several years, petitioner and his advisers determined that it would be more profitable to combine the stocker operation with a calf-cow operation, so that in 1995 it ran 1,050 stockers and 265 cows.

Furthermore, the ranch expanded its operation to take advantage of economies of scale. In 1995, petitioner made the necessary capital outlays to buy more land about 40 miles south of Flying H to bring in productive resources like hay pasture and other resources that were directly related to the cattle program and to provide a cheaper alternative for wintering his cows.

In an effort to generate new sources of revenue, petitioner began a big game hunting operation. Respondent concedes that this program has taken a long time to develop because the ranch needed to improve its wildlife habitat, allow the game on the ranch to mature, and adjust the herd distributions. Moreover, the trophy hunting business is a new industry in the west, and it takes a long time to produce high quality game and build a clientele of hunters. Respondent further concedes that the game hunting program is expected eventually to be a thriving, profitable aspect of the ranch.

In passing we note that while petitioner did occasionally use the ranch for recreational hunting, the parties stipulated that none of the expenses at issue concern petitioners' personal use. Moreover, petitioner's use of the ranch was no different from that of other farmers and ranchers who hunt and fish on their own lands. We find that any element of personal recreation the petitioner derived from the ranch was merely incidental to the overall ranching activity. See Hoyle v. Commissioner, supra

(farm activity was operated for profit despite the fact that the taxpayer and his children used it for vacations).

Thus, based on the entire record we find that petitioners operated Flying H with an intent to make a profit, and therefore the losses incurred during the years in issue are fully deductible.

Issue 3. Whether Petitioners' Polo Sales Activity Known as Bendabout Polo Sales & Management Co. Was an Activity Engaged in For Profit

Bendabout Polo Sales & Management Co.

Bendabout Polo Sales and Management Co, or BPS, is a partnership, of which petitioner owns 75 percent and S.K. Johnston, petitioner's son, owns 25 percent. BPS began operations in 1986 as a polo horse sales business. BPS' sales were primarily conducted in southern Florida, while the polo pony training operations were conducted at Bendabout in Tennessee and Flying H in Wyoming.

Petitioner is a longtime amateur polo player and served as president of the U.S. Polo Association from 1980 to 1984 and chairman from 1984 to 1988. Petitioner retired from playing polo in 1989, and the parties stipulated that he did not ride any of BPS' polo ponies during the years in issue.

Petitioner has developed many contacts in the polo community worldwide. Based on his knowledge of polo and his contacts with people involved in the sport, petitioner thought there would be a profitable market for selling polo ponies. Respondent concedes

that petitioner's contacts in the polo community were helpful in selling horses.

The parties stipulated that BPS employed expert advisers and competent and qualified persons to carry on its horse sales activities.  In 1986, petitioners hired Jeff Atkinson (Atkinson), a seven-goal professional polo player and professional horse trainer, to run BPS.  Atkinson's duties included training horses, supervising grooms, organizing the shipping of the horses, and selling horses.  Prior to joining BPS, Atkinson had been in the polo sales business for many years.  During that time, his sales business accounted for over 60 percent of his income, and he had sold more than 100 polo ponies.

The initial strategy of BPS was to purchase horses in Argentina because of the country's reputation in the polo community for producing high-quality horses.  Some of these horses would be ready to play with little training and could be resold immediately.  Petitioner and Atkinson thought that BPS would be able to double its money on those horses because petitioner had a source from which BPS could acquire the horses cheaply.  BPS also intended to develop a brood mare string from the Argentinean horses, breed the mares, and train and sell the foals as polo ponies.  During the years at issue, BPS generally had about 12 to 24 horses in training and for sale at any one time.

Polo ponies are generally sold in private transactions where the prospective purchaser tries out the pony by riding it and playing it in a polo game. It typically takes 2 years of training before a pony is ready for sale. Petitioner and Atkinson believed that the best strategy for selling a polo pony is to show a horse's abilities either by allowing a prospective purchaser to ride the horse during a polo game, or by playing a horse in a highly visible tournament where purchasers pay high stakes for horses that play well. Atkinson encouraged S.K. Johnston to play BPS' horses in matches to show potential purchasers that the horses were not only good for professional players, but for amateurs as well. With respect to advertising, the plan was to play the higher level tournaments to make a name for the company and establish its credibility; the idea was that the exposure in the higher level tournaments would eventually pay off. During the years in issue, a top quality polo pony would sell for $30,000 or $40,000, and an average polo pony would sell for around $10,000. The higher the tournament played, however, the higher the costs.

To get ready for the winter selling season in December, BPS' schedule began in October. Atkinson, along with the required number of grooms, traveled with the horses to Florida where most of the elite polo clubs are located. The sale season lasted from the end of December until the beginning of April. In April, they would return to Bendabout or Flying H, to allow the horses that

had not been sold to recuperate, and start training another string of horses for the summer selling season. This string was not of the same quality as the Florida horses, because the level of play at the summer selling clubs was not as high, and second-tier purchasers were not willing to spend as much money.

Petitioner and S.K. Johnston would meet with Atkinson at the beginning of each year to discuss the selling strategy during the upcoming season. During this time the three of them would decide which clubs and tournaments Atkinson would travel to based on the caliber of clientele attending. Atkinson knew the level of players at the various clubs and tournaments and what the purchasers at those events would be willing to spend. Based on that information, petitioner, S.K. Johnston, and Atkinson decided which ponies Atkinson would take with him to Florida. They would also prepare a budget for the upcoming sales season.

During the years at issue, BPS made additional income from an annual sponsorship fee that Coca-Cola Co. paid the partnership to put together a polo team to play in matches.

BPS faced a history of losses. After losing its key employee, BPS sold off the remaining horses and in 1993 the partnership was dissolved.

Discussion

Once again, respondent points to a history of losses, petitioners use of such losses to offset other income, and the

pleasure aspect of the activity to establish that petitioners did not have a profit objective.[9]

The parties stipulated that petitioners carried on their horse sales activity through BPS in a businesslike manner, maintained complete and accurate books and records, and employed expert advisers and competent help in operating BPS. Atkinson, BPS' primary adviser, was a seven-goal professional polo player and horse trainer, who owned a profitable pony polo sales business for many years prior to coming to work for BPS.

Moreover, petitioner himself had extensive knowledge in this field. As a longtime amateur polo player and past president and chairman of the U.S. Polo Association, petitioner developed polo contacts worldwide. Based on his knowledge of polo and his contacts with people involved in the sport, petitioner thought he could make a profit selling polo ponies. Respondent concedes that petitioner's contacts in the polo community were helpful in selling horses. Moreover, petitioner knew inexpensive sources of supply for polo ponies in Argentina. Thus, BPS' strategy was to purchase horses cheaply, train them, and sell them at a profit.

Respondent argues that BPS' failure to spend more than minimal funds on advertising is persuasive evidence that BPS was

---

[9]     For 1987 and 1989, the term petitioners in this context refers to petitioner and Gillian Johnston and S.K. Johnston and Julie Boyle. For 1988, Gillian Johnston filed a separate return and a notice of deficiency was not issued to her with respect to BPS. Accordingly, for 1988, the term petitioners in this context refers to only petitioner, S.K. Johnston, and Julie Boyle.

not engaged in selling ponies for profit. We disagree. BPS did not spend a lot of money on advertising through conventional means, such as listing ads in various horse magazines. BPS did, however, expend substantial sums on registration fees to enter its horses into tournaments. Respondent concedes that polo ponies are generally sold in private transactions where the prospective purchaser tries out the pony by riding it and playing it in a polo game. Accordingly, petitioner and Atkinson believed that the best advertising strategy was to show a horse's abilities either by allowing a prospective purchaser to ride the horse during a polo game, or by playing a horse in a highly visible tournament where purchasers pay high stakes for horses that play well. Thus, BPS' advertising plan was to establish credibility and make itself known by high level, visible tournament play.

That petitioner and S.K. Johnston devoted ample time to BPS is further evidence of a profit motive. At the beginning of each year, they met with Atkinson to discuss strategies for the upcoming season. They planned the clubs and tournaments that Atkinson would travel to, decided which ponies Atkinson would take with him to Florida, and prepared a budget for the upcoming sales season which petitioner reviewed throughout the year.

Finally, that BPS was ultimately liquidated in 1993, after losing its key employee and facing a history of losses is additional evidence that the activity was not a hobby. "If the

horse operation were a mere hobby, activity for pleasure, or a business founded solely for tax benefits, it would not seem petitioner would entirely abandon the operation." Trafficante v. Commissioner, T.C. Memo. 1990-353.

Thus, based on the entire record we find that petitioners, through BPS, operated their horse sales activity with the intent to make a profit. Accordingly, petitioners' related losses for the years in issue are deductible.

Issue 4. Whether Gillian Johnston's Horse Training Activity Known as GJ Stables, Conducted at Bendabout Farm, Was an Activity Engaged in For Profit

GJ Stables

During the years in issue, Gillian Johnston, a licensed steeplechase horse trainer since 1964, operated a steeplechase training and racing activity known as GJ Stables out of a converted cow barn and pasture on approximately 35 acres at Bendabout farm. Gillian Johnston has had one assistant for at least 8 years. Respondent stipulated that petitioners employed competent help to carry on the horse training and racing activities of the stable.

Unlike a breeding stable which makes money by selling horses, a racing stable such as GJ makes money primarily by racing its horses to win purses. There is, however, always the possibility that a very successful racing horse may be purchased.

In operating the stable, Gillian Johnston consulted with recognized experts in the steeplechase business, including Dr.

John Griggs (Dr. Griggs).  Dr. Griggs served on the board of directors of the Midwest Steeplechase Association and had been involved successfully in the steeplechase business for many years.  He was honored by the National Steeplechase Association on several occasions for having superior horses, and he has trained horses that won the Eclipse Award, which is the highest honor awarded to a steeplechase horse.

The stables would typically have five to six horses in training at a time.  Gillian Johnston owns all of the steeplechase horses that she trains; she does not train other people's horses.  Generally, she would get the horses in competitive condition at GJ and then she would send them to experts in Pennsylvania for galloping and jumping training.  The horses would be returned to the stables for further exercise prior to being entered into a steeplechase tournament.

During the years in issue, Gillian Johnston spent most of her time tending to the business of GJ Stables.  On weekdays, she would work in the stables from 8:30 a.m. until late afternoon with the help of one assistant.  On weekends, she would work in the stables all day, starting at 7 a.m., without any assistance.  Once trained, the horses would compete for substantial purses on the regular steeplechase circuit.  Currently, purses at some of these races exceed $100,000.  GJ's horses have won major steeplechase races, including Saratoga in 1987 and 1991.  Gillian Johnston has not done any steeplechase racing in this country;

rather she employs professional jockeys to ride the horses in all races.

Discussion

Respondent points to three factors to show a lack of profit motive for the years in issue:[10]  A history of losses, petitioners' use of such losses to offset other income, and the pleasure provided by the activity.

The parties stipulated that Gillian Johnston[11] carried on her steeplechase activity in a businesslike manner, maintained complete and accurate books and records, had expertise in steeplechase training and racing, and employed competent help in carrying on such activity.  Moreover, she consulted with other recognized experts in the steeplechase business, including Dr. Griggs.

During the years at issue, Gillian Johnston personally operated the stables on a full-time basis.  On weekdays, she worked in the stables from 8:30 a.m. until late afternoon with the help of one assistant.  On weekends, she worked all day, starting at 7 a.m., without a helper.  The work she performed was

[10]  The Johnstons filed joint returns for 1987 and 1989, and separate returns for 1988.  Respondent did not issue a deficiency notice to Gillian Johnston for 1988, and the notice issued to petitioners for 1988 does not make a determination with respect to the stables.  Thus, 1987 and 1989 are the years in issue with respect to GJ Stables.

[11]  With respect to GJ Stables, although respondent issued a joint notice of deficiency to the Johnstons for 1987 and 1989, the parties stipulated that it was Gillian Johnston who operated the stables during the years in issue.

time-consuming, physically exhausting, and dirty. In fact, the parties stipulated that she regularly performed hard manual and menial labor at the stables, including exercise and training of steeplechase horses in good weather and bad, feeding and grooming horses, cleaning tack and other equipment, washing blankets and bandages, mucking out stalls, cleaning and disinfecting the stables, and transporting the horses to races. Gillian Johnston's personal effort is highly persuasive evidence of her profit motive, especially given that she had the financial means to hire as many stable hands and grooms as she wanted.

With respect to expenses, we note that on brief, respondent conceded that Gillian Johnston "scrupulously watches costs, shopping around for the best deals on feed and equipment and repairing equipment rather than throwing it away."

We note that although GJ's operations were unsuccessful during the years at issue, racing businesses are highly speculative and risky by nature. The activity, however, provided Gillian Johnston an opportunity to earn substantial profits by having her horses compete for large purses. GJ has had some successes, winning as much as $25,000 in one race. The current purses at some of the races in which GJ's horses compete exceed $100,000. We note that an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit

even though losses or only occasional small profits are actually generated.  Sec. 1.183-2(b)(7), Income Tax Regs.

Respondent focuses on the fact that Gillian Johnston grew up training and racing horses, enjoys steeplechase training, and still loves to ride.  Thus, respondent contends that most of her activities in connection with GJ Stables were for pleasure and recreation rather than for business.  We disagree.  First, we note that Gillian Johnston has not done any steeplechase racing in this country, and she employs professional jockeys to ride the stable's horses in all races.  Moreover, if GJ was actually a hobby, Gillian Johnston most likely would have hired others to perform the dirty tasks associated with running a stable.  However, in an effort to reduce costs, she performed these arduous tasks herself, including shoveling horse manure.

Finally, in passing we note that the tax law does not prohibit an individual from enjoying his or her work.  See Cole v. Commissioner, T.C. Memo. 1992-51 (personal pleasure derived from operating a pecan farm did not indicate lack of profit motive).

Thus, based on the entire record, we hold that GJ Stables was an activity engaged in for profit.  Accordingly, petitioners may deduct their related losses sustained during the years in issue.

Issue 5. Whether $1,131,438 Was the Fair Market Value of a Conservation Easement Encumbering the Flying H Ranch, Donated By Petitioners to the Nature Conservancy During 1989

The Conservation Easement

In December 1989, petitioners donated to the Nature Conservancy (the Conservancy) a conservation easement encumbering 4,898 acres of the Flying H Ranch (the easement). The parties stipulated that the easement was a "qualified conservation contribution" for the purposes of section 170(f)(3)(B)(iii) and (h).

The easement encumbers a highly aesthetic portion of Flying H know as Moncreiffe Ridge located near Big Horn, Wyoming. The ridge forms the highest part of the property with deeded lands descending to the north, south, and west. The land consists of level to rolling foothill rangelands that vary from open to timbered land along the west slopes of the Big Horn Mountains, and is bounded on its southern border by the Big Horn National Forest. Most of the easement's northern boundary is bordered by Wyoming State lands.

Several improved gravel roads provide direct access to the property from petitioners' property, and the easement grants the Conservancy the right of access for ingress and egress. The easement has superior interior access that is provided by a gravel road known as the Gulf road, constructed for oil and gas exploration by Gulf Oil in the early 1980's, and numerous jeep trails. The Gulf road traverses the lower areas of the easement along the northern slope of Moncreiffe Ridge and continues to the extreme southern areas on the property adjacent to Bighorn

National Forest. The road terminates at a large level site where the Gulf drilling rig once operated. At this site there are several capped water wells. Electrical power is installed to the northeast corner of the property where several radio towers are located.

The property affords panoramic views of the Sheridan Valley and the Big Horn National Forest. It has numerous flowing streams, onsite springs, and level sites suitable for rural development. There are no zoning restrictions on the property provided the land is divided into lots of 35 acres or more. The area of Sheridan County is well known for its recreational aspects that over the years have attracted guest ranching enterprises and rural estate residences. There is a 2,000-acre rural development in the high mountain area approximately 4.5 miles north of the easement known as Teepee Creek, consisting of approximately 20 different ownerships of seasonal cabins and recreational-type properties. The Teepee Creek property is accessible from a public road which is closed during the winter because the county does not plow snow. The Equestrian Hills Development in Big Horn, Wyoming, lies just off the northeast corner of the lower portion of Flying H, and the easement is near the Bighorn Equestrian Center, one of the oldest polo clubs in the United States.

The easement allows Flying H to graze and range horses, cattle, and buffalo. It allows petitioner to continue to use the

three cabins already existing on the property.  The easement also gives petitioner the right to construct one additional cabin on the property not to exceed a height of 20 feet and area of 1,500 square feet on each floor.

The upper area of Flying H, which incorporates the easement, is utilized by the ranch for summer livestock grazing.  Cattle are moved up onto the easement, as well as onto adjoining national forest lands, over which Flying H controls grazing rights.  The easement, however, places numerous restrictions on petitioners' right to use the property.  Development of the property by subdivision is completely prohibited, as are all residential, commercial, or industrial uses.  Oil and mineral exploration and extraction are prohibited.  Agricultural use is severely limited; no crops can be grown, and no timber can be harvested.  Livestock grazing is restricted to 300 Animal Unit Months[12] (AUM's) per year.  In addition, the easement gives the Conservancy several possessory rights, such as the right to enter the property, to cut and remove vegetation, and to conduct prescribed burns.

### Norman C. Wheeler (Petitioner's Expert)

Norman C. Wheeler (Wheeler) is the owner of Norman C. Wheeler & Associates, a 35-year-old agricultural management and consulting firm with offices throughout Montana.  He is a

---

[12] An animal unit month, or AUM is the amount of forage that one 1,000 pound cow will consume with a calf at its side that has not been weaned.

qualified appraiser of rural property, who has been actively engaged in the appraisal field for 18 years. Wheeler has been awarded the designation of Accredited Rural Appraiser (ARA), the highest professional designation offered by the American Society of Farm Managers and Rural Appraisers and is licensed by the State of Montana as a Certified General Appraiser.

Wheeler's field of expertise is in the appraisal of conservation easements, specifically in the western part of the United States. He has completed courses on appraising conservation easements. More importantly, he has been appraising easements in the Wyoming area since 1982. Since that time, Wheeler has appraised more than 100 conservation easements and currently spends 70 percent of his professional time appraising conservation easements which are primarily in the Montana and Wyoming area.

Wheeler's clients have included individual landowners, banks, corporations, and Government agencies, such as the Internal Revenue Service (IRS), the U.S. Department of Agriculture, and the U.S. Forest Service.

John J. Boyett (Respondent's Expert)

John J. Boyett (Boyett) is a State certified general real estate appraiser. Boyett has worked in the appraisal field for the past 28 years and has been employed by the IRS for the last 14 years. Boyett has attended numerous real estate appraisal courses; however, he has never evaluated the effect of a

conservation easement. Boyett has valued farmland and ranches for individual farmers and for companies. His experience is primarily confined to the southeast.

Discussion

On their 1989 return, the Johnstons claimed a $960,000 charitable contribution deduction for the easement granted to the Conservancy. The amount of the deduction was based upon an appraisal which valued the property before the easement at $2,035,000[13] and after the easement at $1,075,000; the $960,000 difference between the before and after value represents the value of the easement. Respondent determined that the easement reduced petitioners' property value by $203,500,[14] not $960,000 as claimed on their 1989 return. Accordingly, respondent reduced petitioners' deduction for the value of the easement by $756,500; the difference between the $960,000 claimed on their original 1989 return and the $203,500 allowed by respondent pursuant to the notice of deficiency.

---

[13]   On brief, respondent concedes that $2,057,160 was the property's value before the easement. This amount is $22,160 greater than petitioners' original valuation of $2,035,000.

[14]   In the notice of deficiency, respondent determined that the easement reduced petitioners' property value by $203,500. On brief, however, respondent contends that the easement reduced petitioners' property value by $407,000, which is double the amount originally allowed by respondent in the notice of deficiency. Although, the record is silent as to why respondent made this adjustment, we find this to be a concession in petitioners' favor.

The parties agree that the easement granted by the Johnstons in December 1989 was a qualified conservation contribution under section 170(f)(3)(B)(iii) and (h), and that the grant of the conservation easement qualifies as a deductible charitable contribution under section 170(a)(1) and (c).  Unresolved, however, is the value of the charitable contribution amount.  Subsumed in this issue is the question of whether the highest and best use of the property before the date of gift was predominantly rural development as argued by petitioners, or whether it was primarily recreational as argued by respondent.

An easement is an interest in real property that conveys use, but not ownership, of a portion of an owner's property.  Dorsey v. Commissioner, T.C. Memo. 1990-242.  The value of an easement is estimated as some part of the amount of value it adds to the property it benefits, or the loss in value to the property it burdens.  Id.

The amount allowable as a deduction with respect to a charitable contribution of property is usually determined by the fair market value of the property donated; i.e., the price at which the property would change hands between a willing buyer and willing seller, on the date of the gift.  Sec. 1.170A-1(c)(2), Income Tax Regs.  A conservation easement, however, is normally granted by deed of gift; consequently, there is rarely an established market from which to derive fair market value.  See Symington v. Commissioner, 87 T.C. 892, 895 (1986).  Therefore,

the fair market value of an easement usually will be determined indirectly by applying a "before-and-after" analysis, thereby determining the negative effect the easement has on the value of the total property.[15]  Thus, the difference between the fair market value of the total property before the granting of the easement and the fair market value of the property after the grant is the fair market value of the easement.  Id.

The fair market value of the easement should be based on the highest and best use for the property on its valuation date, including potential development.  See generally Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986); Hilborn v. Commissioner, 85 T.C. 677, 688 (1985); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.

In determining the before and after highest and best use, the fair market value of property is not affected by whether the owner actually has put the property to its highest and best use. Symington v. Commissioner, supra at 896; Stanley Works v. Commissioner, supra.  Rather, the realistic, objective potential uses for property control the valuation thereof.  Symington v. Commissioner, supra.  Thus, in determining the reasonable and probable use that supports the highest present value we focus on

---

[15]    The before-and-after method of valuing conservation easements is approved by the IRS.  See Rev. Rul. 73-339, 1973-2 C.B. 68, as clarified by Rev. Rul. 76-376, 1976-2 C.B. 53, and endorsed by Congress in connection with the adoption of the Tax Treatment Extension Act of 1980, S. Rept. 96-1007 (1980), 1980-2 C.B. 599, 606.

the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255-256 (1934).

The value of the property after the donation must also reflect its highest and best use. Accordingly, consideration of any new restrictions the easement places on the property must be taken into account. Losch v. Commissioner, T.C. Memo. 1988-230.

To establish the fair market value of the easement, each party offered the report and testimony of an expert witness: Wheeler, for petitioners, and Boyett, for respondent.

At the outset, we note that petitioners' expert had extensive experience appraising conservation easements. In fact, since 1982, Wheeler has appraised more than 100 conservation easements, and spent close to 70 percent of his time appraising conservation easements primarily in Montana and Wyoming. In contrast, Boyett, respondents' expert has never evaluated the effect of a conservation easement on property. Any real estate appraisal experience he has is primarily limited to the southeast.

In determining the value of the easement, Wheeler concluded that the most profitable before use was primarily rural development and recreational use, in connection with agriculture, either in parcels or as a whole. Accordingly, he concluded that the easement had a fair market value at the time

of donation of $1,131,438, which represented a 55 percent reduction in the $2,057,160 before value of the property. Boyett concluded that the highest and best use before the easement was primarily recreational, with some nominal grazing and timber harvesting. Accordingly, he concluded that the easement had a fair market value at the time of donation of $407,000, which represented a 20 percent reduction in the $2,035,000[16] before value of the property.

We note that both experts agree that the before-and-after method should be used to determine the fair market value of the easement, that recreational use was part of the before and after highest and best use, and that the highest and best post-easement use was primarily recreational and secondarily agricultural. They further agree that easements generally are segregated into three categories, and that each category is related to the amount of loss in value the property incurs due to the easement's use restrictions; the more restrictive an easement, the greater the percentage decrease of value to the encumbered property. The difference between both experts' opinions turns on their estimation of the property's highest and best use before the easement was granted and on the after value of the property.

---

[16] The $22,160 difference in the experts' before values is attributable to the fact that, in his comparable sales analysis, Boyett merely relied on the purchase price allocations of another appraiser, whereas Wheeler performed his own independent inquiry to determine the purchase price allocations. On brief, respondent concedes that $2,057,160 was the fair market value of the property before the easement was granted.

After careful consideration of the entire record, we agree with petitioners.

Wheeler determined that the property's highest and best use before the easement would be for rural development comparable to that already existing in the area, together with recreational and agricultural use. Respondent argues, however, that the property has no future development potential, limited agricultural potential, and therefore the highest and best use before the easement would be recreational. To support this position, respondent points to the fact that restrictive land ownerships have precluded intensive development. The owners in the area are investors or established residents who have tried to preserve the aesthetic appearance in the area. In making such argument, however, respondent fails to realize that as long as the highest and best use for which the property is adaptable and needed or likely to be needed in the near future is not prohibited by law, community opposition to such a use does not preclude us from valuing the property as if it were so used. Symington v. Commissioner, 87 T.C. 892 (1986).

Respondent further stresses the fact that pursuant to local ordinances lots created below 35 acres are subject to strict subdivision review. In response to this argument, petitioners correctly point out that rural development does not necessarily mean planned small-tract development as is found in the urban and suburban regions of the eastern United States. Rather,

petitioners argue that rural development in Sheridan County means larger (i.e., 35-acre lots or greater) tract development with residences built on prominent points overlooking scenic views, or rural acreage tracts used for the buyer's personal recreation, or to build cabin sites. Thus, local zoning ordinances have no effect on rural development of the type petitioners describe.

In determining the property's highest and best use, respondent relies heavily on Boyett's finding that the property had no development potential. At trial, Boyett testified that the property at issue is not located in an area where there are other residential or commercial developments. This conclusion is in direct conflict with the evidence. First, we mention that the property is located approximately 5 miles from the Bighorn Equestrian Center, one of the oldest polo clubs in the United States, which also provides community facilities, such as fields for soccer and baseball, and a clubhouse that can be rented out for weddings and funerals. There is a development of houses and cabins just southeast of the property, which is situated on rough mountainous land similar to portions of the easement property. Moreover, just 4 or 5 miles west of the property, there is a 2,000-acre development known as Teepee Creek, which is 1,000 feet higher in elevation than the easement property and has similar mountainous topography. Just off the southwest portion of the easement property, composed of some of the roughest terrain, there is a seasonal cabin of the type commonly found in this

area, and it is accessed by the Gulf Road.  Finally, we mention that at trial and again on brief, respondent argues that even if the property at issue had the possibility of being developed, such potential was diminished by the fact that the easement property was landlocked.  However, such is not the case, because pursuant to the easement, petitioners also granted the Conservancy a right of ingress and egress over their property to access the easement land.

Moreover, at trial, Boyett testified that he talked to many local people in the area, including Century 21 realtors (Century), to assist him in reaching the conclusion that the property did not have development potential.  On October 6, 1993, however, Boyett wrote a memorandum to Archie Thurman, the Appeals officer in the instant case, in which he stated that he spoke with Jack Pelissier (Pelissier) at Century in Sheridan, Wyoming; Bill King (King) at King Land Investments in Big Horn, Wyoming; and Ron Prestfeldt (Prestfeldt) of Prestfeldt Engineering, all of whom concluded that the property had development potential. Pelissier stated that if the Gulf Road accessed the subject easement (which it does), then the property definitely has development potential, because the Gulf Road runs off a county road to the Bighorn National Forest.  Prestfeldt and King noted that Moncreiffe Ridge had the potential to be developed into a retirement community with single-family seasonal dwellings.  In light of these comments, we have difficulty understanding why

Boyett concluded that the property had no future development potential, especially given that rural development indeed exists in close proximity to the property at issue.  Thus, based on the entire record, we agree with petitioners that the highest and best before value use of the property was rural development, with recreational and agricultural use as secondary.

We next turn to the issue of the property's value after the granting of the easement.  At trial, petitioners' expert testified that by prohibiting development and subdivision, the conservation easement prevents the property from attaining its highest and best use.  He concluded that the property, in effect, is reduced to an agricultural-recreational unit, and the other restrictions of the easement limit the agricultural use to 25 percent of its potential.  Wheeler, relying on data provided by the Soil Conservation Service, specifically relating to the carrying capacity of the property at issue demonstrated that the livestock grazing of such property was 1,400 AUM's per year.  The easement restricts grazing to 300 AUM's per year.  Thus, Wheeler concluded that this greater than 75-percent restriction on grazing contributes to the diminution in value caused by the easement, because it narrows the market of potential buyers further than if the easement had only prohibited development. Moreover, at trial, Wheeler credibly testified that the conservation easement in the instant case was one of the most

restrictive he had seen in his more than 13 years of experience appraising conservation easements.

Due to the absence of sales of easement encumbered property in the immediate area to determine the after value of the property, Wheeler examined sales data of easement-encumbered properties in other similar locales. At the time of valuing the easement at issue, Wheeler had tracked the sales of easement encumbered properties in Wyoming and Montana for over 10 years and had developed a database of 13 such sales. Wheeler analyzed each of these sales individually to determine the values associated with the sale, the market conditions at the time of sale, and the easement restrictions placed on the property sold. This information was not available through public records because both Montana and Wyoming are nondisclosure States. Wheeler testified that the goal in analyzing these sales was not to derive a specific per-acre value, but rather to determine the percentage diminution in value due to the conservation easement.

Wheeler credibly testified that the local sales suggested losses due to the conservation easements of between 30 to 60 percent. The percentage diminutions vary directly with the scope and amount of restrictions placed on the property; the more severe the restrictions, the greater the percentage diminution. Wheeler further testified that conservation easements cause reductions in value in direct relation to the amount and type of restrictions placed on the property. The evidence Wheeler

submitted at trial shows that nationwide, the diminutions in value associated with easements prohibiting development and natural resource uses ranged from 64 percent to 90 percent, with an average of 77 percent. Easements prohibiting development, but allowing resource uses such as timber harvesting ranged from 21 percent to 81 percent, with an average loss of 53 percent. Finally, easements allowing development ranged from 5 percent to 39 percent, with an average loss of 22 percent. Wheeler determined, based on the prohibited development of the property at issue, that the easement would be included in the second category, suggesting a minimum average rate of diminution of 53 percent. The most comparable local easement suggested a diminution rate of 59 percent, which, like the easement in the case at bar, was a restrictive development easement that controlled timber and mineral use and reduced livestock grazing by 66 percent. Based on the range of 53 percent to 59 percent, Wheeler concluded that a 55 percent rate of diminution adequately reflected the effect of the easement of the appraised property. Thus, based on the established value of $2,057,160 and the 55-percent rate of diminution in value attributable to the conservation easement, Wheeler concluded that the after value of the property was $925,722. Accordingly, he subtracted the after value from the $2,057,160 before value to get $1,131,438 as the value of the conservation easement.

Respondent criticizes Wheeler's method of determining the after value of the property. Respondent argues that Wheeler did not locate any comparable sales closer to the property at issue than comparables from Montana. At trial, however, respondent's own expert testified that he, like Wheeler, could not find any comparables within "a long distance of Sheridan." Boyett used comparables from sales in Colorado, Montana, Idaho, and in the Yellowstone Park vicinity of Wyoming.

Respondent also argues that a 55-percent reduction to the value of the easement property is excessive. Respondent bases this argument primarily on Boyett's conclusion that the 300 AUM's restrictions under the easement did not affect the after value of the property at all. We find Boyett's analysis to be flawed. Boyett's conclusion was based on the following: (1) A discussion with MacCarty, the former ranch manager, during which time MacCarty told him that the easement's restriction of grazing to 300 AUM's did not affect the after value of the property, because Flying H did not intend to run more than 300 AUM's on the easement property, and (2) his own calculations. First, we note that Boyett's conversation with MacCarty regarding petitioners' intentions for the use of the property is irrelevant in determining the highest and best use. <u>Dorsey v. Commissioner</u>, T.C. Memo. 1990-242. Value is not affected by whether an owner actually intends to put, or has put, the property to its highest and best use before the date of donation. Moreover, were we to

rely on Boyett's calculations, we would have to reject the site specific data provided by the Soil Conservation Service that the AUM capacity was 1,400 AUM's per year.  We are not prepared to do this.  Finally, based on the data submitted by petitioners at trial, we find that a 55-percent diminution factor is a conservative diminution estimate.

Thus, based on the entire record, we hold that $1,131,438 was the fair market value of the conservation easement encumbering the Flying H Ranch donated by petitioners to the Nature Conservancy during 1989.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for petitioners</u>.