JOHN R. AND LEE H. ARWOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Arwood v. Commissioner
Docket No. 27227-90
United States Tax Court
T.C. Memo 1993-352; 1993 Tax Ct. Memo LEXIS 353; 66 T.C.M. (CCH) 340; August 11, 1993, Filed *353 Decision will be entered under Rule 155. For petitioners: Thomas E. Tyre. For respondent: Arthur Yellin and Steven W. Ianacone. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in and additions to petitioners' income tax as follows: Additions to Tax
Sec. Sec. Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661
1984
$ 31,236
-0-
-0-
-0-
1985
19,344
-0-
-0-
$ 7,809
1986
92,827
$ 4,641
[1]
4,836
1987
47,700
2,085
[1]
18,862
After concessions, the sole issue for decision is whether petitioners engaged in horse breeding and racing with an actual and honest profit objective in 1984, 1985, 1986, and 1987. We hold that they did. References to petitioner in the singular are to John R. Arwood. Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated *354 and are so found. 1. Petitioners
Petitioners are married and filed joint returns for 1984, 1985, 1986, and 1987. They lived in North Caldwell, New Jersey, when the petition was filed. Petitioner worked in Wayne, New Jersey, as the resident director for TNT Limited, a publicly held, international transportation company. Petitioner also owned trucking businesses in North Carolina and New Jersey, a travel agency in New Jersey, rental property in South Carolina, and an interest in a commercial ship operating company. In 1985, petitioner semi-retired and he and his family moved to North Carolina. Later in that year, a British company purchased an interest in TNT Limited and required petitioner to return to New Jersey to work as chief executive. His family remained in North Carolina for that year. Petitioner commuted between North Carolina and New Jersey. 2. Petitioner's Education and Experience
Petitioner grew up on a 60-acre farm near Charlotte, North Carolina. In 1951, he attended Elon College in Elon, North Carolina. In 1952, he transferred to North Carolina State University (N.C. State). At N.C. State he initially majored in agriculture and planned to become *355 a veterinarian. He studied animal husbandry and genetics and lived on a research farm involved in genetic research on pigs and cows. In 1952, petitioner was appointed to and attended the Naval Academy, but he was discharged after injuring his shoulder playing football. He returned to N.C. State in 1954. In 1954, he was accepted to the veterinary school at the University of Georgia, but he could not afford to attend. He changed his major and graduated from N.C. State with a bachelor of science in industrial engineering in 1956. 3. Ralph T. Branca
Ralph Branca (Branca) was a pitcher for the Brooklyn (now Los Angeles) Dodgers. He has been actively involved in ownership and racing of standardbred horses since 1977. He met petitioner in 1977 or 1978. Branca buys, sells, trains, and races horses. His horse-racing operation is profitable. 4. Rick Nuhn
Rick Nuhn (Nuhn) is an owner, breeder, and trainer of standardbred horses. He has been training horses since 1977. He buys and sells horses and advises horse owners and buyers. Branca introduced Nuhn to petitioner in 1981. Nuhn has worked for petitioner ever since. The parties agree that Nuhn is an expert on *356 standardbred horse operations. Nuhn advised and assisted petitioner in purchasing standardbred racing horses and broodmares, and trained and cared for petitioner's horses at a training facility at Intertrot Stables in Englishtown, New Jersey. 5. Petitioner's Horse-Breeding Operation
Around 1978, petitioner became interested in standardbred horses after Branca explained his success in the business. Branca convinced petitioner that standardbred horse racing could be very profitable if run properly. Petitioner bought his first horse in October 1981. During the years in issue petitioner owned four horses and part interests in three others. Petitioner telephoned or met with Nuhn once or twice a week to discuss his horse operations. Petitioner subscribed to several horse magazines. Each year he bought the United States Trotting Association's (USTA) yearbook and its Sires and Dams book. The USTA yearbook lists all races sanctioned by USTA for the year, and includes information about horses that raced, such as a horse's sire and dam, the number of races won, and the amounts earned by each horse. The USTA Sires and Dams book lists all USTA registered broodmares and stallions. *357 Petitioner registered his horses with the USTA and advertised sales of his horses in industry journals. Petitioner insured his horses in 1984, but he later stopped because he thought it was not worth the cost. Nuhn did not insure his horses because he also believed it was not cost-effective. Petitioner maintained separate accurate books and records for his horses for each year including breeding records, photographs, and registration forms. He used the same bank accounts for his investments and his standardbred horse operations, but he did not commingle personal accounts with these accounts. Petitioner did the following in connection with racing his horses: He selected racing programs with Nuhn's assistance, paid nomination fees to make the horses eligible to race, and attended some races to evaluate the performance of his horses. Petitioner did the following in connection with breeding his horses: Determined when and where to stand his stallion as a stud, approved the mares nominated for breeding with his stallion, maintained breeding logs and records of mares bred, assured compliance with rules and regulations of the USTA and the Standard Bred Owners Association of New Jersey, *358 issued mating certificates, selected mares suitable for crossbreeding, selected studs for his mares, contracted for stud services, arranged for turnout locations for mares and foals, and visited other stables. While petitioner commuted from North Carolina, he continued to visit his horses stabled in New Jersey. 6. Petitioner's Horse Racing and Breeding
a. Man on Deck
In October 1981, petitioner purchased a 75-percent interest and Branca purchased a 25-percent interest in a stallion named Ambro Barrister. They changed his name to Man on Deck. Man on Deck is the offspring of the stallion, Speedy Crown, and the mare, Scintillate. Speedy Crown was the number one trotting stud in the United States (i.e., he received the highest stud fees) when petitioner purchased Man on Deck. In addition, Man on Deck's half brother, Speedy Somali, is the most successful trotting stallion in New Jersey. Before petitioner purchased Man on Deck, he met with Nuhn a few times and read various professional magazines, such as Horseman and Fair World, Hoofbeats Magazine, and a text on the care and training of harness horses. Nuhn assisted petitioner and Branca in purchasing Man on Deck. *359 From 1981 to 1987 Nuhn trained and cared for Man on Deck. In March 1982, Man on Deck unexpectedly injured a ligament and became permanently lame. Because of Man on Deck's strong bloodline, petitioner decided to use Man on Deck as a stud rather than dispose of him. Man on Deck had never raced and thus was not established as a winner. However, other stallions, such as Niles Hanover and Samdhi, had become premier studs without racing. Branca preferred horse racing to breeding. After the injury, Branca sold his interest in Man on Deck to petitioner, and advised petitioner about buying certain mares to breed with Man on Deck. b. Petitioner's Business Plan for Breeding Horses
After Man on Deck's injury, petitioner wrote a business plan dated May 15, 1982, to establish a breeding operation. The objective stated in the plan was to develop a successful program for breeding trotting horses. It takes approximately 4 years from birth for a horse to prove its ability on the track. The plan recognized that it can take 5 to 6 years to determine whether a stallion's "get" (i.e., offspring) are successful. In the plan, petitioner estimated that it would take 7 to 10 years to establish *360 Man on Deck and his breeding program. Petitioner stood Man on Deck at a farm in New Jersey in accord with his 1982 business plan. In his plan petitioner stated he intended to register Man on Deck for breeding in 1983, but he waited until 1986. He also stated in his plan that he would not charge stud fees until Man on Deck's get had proven themselves on the track. His plan indicates that petitioner believed Man on Deck, if bred with the best mares, could produce get that would compete with his half brother Speedy Somali's get. Speedy Somali received $ 10,000 per breeding and Speedy Crown, Man on Deck's sire, received $ 40,000 per breeding in New York. As petitioner planned, he acquired four mares to breed with Man on Deck. c. Stud Fees
Petitioner paid around $ 10,000 per year to maintain Man on Deck, which was approximately twice the cost he estimated in his plan. In 1986, he listed Man on Deck in New Jersey for a stud fee of $ 600. He stopped listing Man on Deck in New Jersey in 1988. In 1990, petitioner registered Man on Deck in Easton, Pennsylvania, for a stud fee of $ 750. Petitioner never received stud fees for Man on Deck in New Jersey or Pennsylvania. d. *361 Mariners Pride
In December 1981, petitioner acquired an 80-percent interest and Nuhn acquired a 20-percent interest in the stallion, Mariners Pride, for a total cost of $ 10,000. Petitioner raced Mariners Pride as a 2-year-old. The horse raced well in 1983 or early 1984 and won some races that year. Around 1984, Mariners Pride unexpectedly developed bleeding of the lungs. Using a drug intended to control bleeding, Mariners Pride continued to race. However, the medication did not work and the horse stopped racing in 1985. Petitioner kept Mariners Pride for 3 more years as a stud but he did not register him or charge fees for him. Petitioner and Nuhn sold Mariners Pride in 1988 for $ 250. e. Petitioner's Horse Racing
Petitioner continued to race some of his other horses. For example, he raced a mare named Jitney Star for a season and then bred her to Man on Deck. He also raced a mare named Romper. Romper was the Garden State Fair's Champion (i.e., she was the number one horse among those that raced in the Fair Stakes in New Jersey) in her 2-year-old season in 1983 or 1984. Petitioner's horses did win some small purses during the years in issue. f. Broodmares *362 and Offspring
Petitioner purchased three mares to breed with Man on Deck in 1982 and one in 1984. The first offspring was born around April 1984. Man on Deck sired 24 horses. Nuhn trained eight and raced four of them. Petitioner also bred his mares to unrelated stallions to prevent inbreeding. He did not want Man on Deck to breed with his direct offspring. Petitioner bred the four mares to Man on Deck for 4 years, but was unhappy with the results, so he sold three of the four mares and several of the offspring. He kept Romper and bred her with Workaholic, a stallion owned by an unrelated party. This breeding produced Romper Boy. Petitioner sold his horses' offspring for prices ranging from $ 1 to $ 22,000. Petitioner sold Mariners Stargazer, one of Man on Deck's get, for $ 22,000 after she ran a 2-minute mile. A trotter that can run a mile in 2 minutes is rare. Romper also ran a mile in 2 minutes. Petitioner sold some of the offspring that did not have racing or breeding potential for $ 1 to avoid spending up to $ 3,000 a year to maintain them. The selling dates and prices for the offspring are as follows: Offspring sold:
Date born
Date sold
Sale price
Jonathon Seagull
4/29/88
9/24/90
$ 750
Mariners Calypso
4/21/84
3/3/88
2,500
Mariners Lady
5/12/84
3/3/88
2,500
Mariners Lass
4/29/85
6/8/89
1
Mariners Port-O-Call
4/2/87
1/10/90
500
Mariners Sandpiper
3/19/86
12/27/88
3,000
Mariners Seafares
4/1/88
1/10/90
500
Mariners Seafoam
4/26/88
1/10/90
500
Mariners Seaurchin
5/14/86
1/23/89
1
Mariners Starfish
4/9/86
1/23/89
1
Mariners Stargazer
4/6/87
3/6/91
22,000
Mariners Stormy Sea
2/27/87
7/13/90
1,000
Ocean Mist
5/5/85
9/1/88
250
Romp Home
4/24/88
9/24/90
750
*363 g. Horses Owned By Petitioner at the Time of Trial
At the time of trial, petitioner owned Man on Deck, Romper, Romper Boy (a 2- or 3-year-old), Romp with the Wind (a 1- or 2-year-old), and an unnamed yearling filly. 7. Petitioner's Gross Income and Horse-Related Losses
For the years in issue, petitioner's income from wages and salaries, interest, dividends, and capital gains was as follows: Wages &
Nonhorse Year
salaries
Interest
Dividends
capital gains
1984
$ 266,298
$ 42,206
$ 13,035
$ 6,363
1985
264,368
36,559
17,699
9,514
1986
358,381
11,818
26,331
112,503
1987
285,533
7,624
36,088
149,224
Petitioner claimed the following horse breeding and racing income and losses on Schedules C: Year
Income
Expenses
Depreciation
Net loss
1984
$ 154
$ 47,916
$ 17,027
$ 64,789
1985
-0-
29,840
11,506
41,346
1986
2,012
84,212
-0-  82,200
1987
927
77,557
-0-  76,630
8. Petitioner's Personal Enjoyment of Horses
Petitioner did not retain the horses for his or his family's personal pleasure. No one in petitioner's family rode his horses. Petitioner attended only his horses' races, and he did not attend *364 all of those. Petitioner disposed of horses when they were no longer useful for breeding or racing. OPINION Section 183(c) disallows all deductions for activities not engaged in for profit. In this context, "profit" means economic profit, independent of tax savings. Herrick v. Commissioner, 85 T.C. 237, 255 (1985); Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). The test for deciding whether an activity is conducted for profit is whether the taxpayer entered into the activity with an actual and honest profit objective. Surloff v. Commissioner, supra; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation need not be a reasonable one, but there must be a good faith profit objective. Dreicer v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs. The burden of proof is on the taxpayer. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), *365 affd. without published opinion 647 F.2d 170 (9th Cir. 1981). We give greater weight to objective facts than to a taxpayer's mere statement of intent. Cherin v. Commissioner, 89 T.C. 986, 992 (1987). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of nine factors which can be used in deciding whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor controls. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, supra; *366 sec. 1.183-2(b), Income Tax Regs.
1. Manner in Which the Activity Is Conducted
Conducting an activity in a manner substantially similar to comparable businesses which are profitable may indicate that a taxpayer engaged in an activity for profit. Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979). Maintenance of complete and accurate records may also indicate a profit objective. Elliott v. Commissioner, 90 T.C. 960, 971-972 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); sec. 1.183-2(b)(1), Income Tax Regs. A change in operating method can indicate a profit motive. Ronnen v. Commissioner, 90 T.C. 74, 93 (1988); Appley v Commissioner, T.C. Memo. 1979-433; sec. 1.183-2(b))(1), Income Tax Regs. Respondent concedes that petitioner carried on the activity in a "somewhat" businesslike manner. However, respondent argues that this factor is neutral because: (1) Petitioner used the same bank accounts for his horse activity and his other investments, and (2) there is no evidence that petitioner changed his *367 operating methods or adopted new techniques or abandoned unprofitable methods in order to improve the profitability of his activity. We disagree. First, petitioner did not use the same bank accounts for his horse activity and his personal finances, but he used the same bank accounts for his horse activity and for his investments. Petitioner's books and records clearly indicated his income and expenses from the horse activity. Petitioner kept separate records for each horse, separate files for each year in the activity, and complete breeding records for every horse. His recordkeeping indicates a profit objective. See Suiter v. Commissioner, T.C. Memo. 1990-447; Appley v. Commissioner, supra.
Second, petitioner changed his operating methods in response to his circumstances. He bought Man on Deck and Mariners Pride in 1981 for harness racing. After Man on Deck became lame in 1982, petitioner tried to establish him as a stud and began to acquire brood mares. He also continued to train Mariners Pride for racing and began to train and race other horses. We conclude that petitioner operated his horse activity in *368 a businesslike manner by, e.g., hiring a trainer, paying experts to care for his horses, advertising the sale of his horses in trade journals, selling foals, training and racing his horses that had potential to win, and modifying his breeding and racing strategy as needed. This factor favors petitioner. 2. The Expertise of the Taxpayer or His Advisers
Efforts to gain experience and a willingness to follow expert advice are considered in deciding if there is a profit objective. Engdahl v. Commissioner, supra at 668 (taxpayer's continuous and informal consultation with experts such as veterinarians, horse trainers, and other horse owners demonstrated a profit motive). Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, and consultation with experts in the business, may indicate that the taxpayer entered into the activity for profit. Pirnia v. Commissioner, T.C. Memo. 1989-627; sec. 1.183-2(b)(2), Income Tax Regs.
Respondent argues that petitioner lacked expertise in horse breeding because he did not obtain a degree in animal husbandry. We disagree. *369 Petitioner was raised on a farm and studied animal husbandry and genetics for 1 to 2 years in college. In addition, before starting and while conducting his horse operations, petitioner researched the horse industry, read trade magazines, and consulted with Branca and Nuhn as to the profitability and operation of the activity. This factor favors petitioner. 3. Taxpayer's Time and Effort
The fact that a taxpayer devotes much of his or her personal time and effort to conducting an activity may indicate a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs. Respondent argues that petitioner did not spend enough time in the horse activity. However, because petitioner hired and relied on an expert, it was not necessary for him to take a more active role in the operations to have a bona fide profit objective. Appley v. Commissioner, supra; sec. 1.183-2(b)(3), Income Tax Regs.
This factor is neutral. 4. Expectation of Appreciation in Value
The term "profit" includes appreciation in the value of assets used in the activity. Sec. 1.183-2(b)(4), Income Tax Regs. While a reasonable expectation of profit is not required, a bona *370 fide objective of making a profit must exist. Dreicer v. Commissioner, 78 T.C. at 643-645. Respondent argues that petitioner did not anticipate that his assets would appreciate. Petitioner's horse-breeding operations required a long startup period. Both parties agree that it takes at least 4 years to show the value of a stallion's get. Due to the success of Man on Deck's sire and brother, his own strong bloodline, and the time it takes to establish a stallion's get, we conclude that petitioner had a bona fide expectation during the years in issue that the horses would appreciate in value. See Engdahl v. Commissioner, 72 T.C. at 668-669; Harvey v. Commissioner, T.C. Memo. 1988-13. This factor favors petitioner. 5. Taxpayer's Success in Other Activities
The fact that the taxpayer has previously engaged in similar activities and converted them from unprofitable to profitable enterprises may indicate a profit objective, even though the activity is presently unprofitable. Pirnia v. Commissioner, supra; sec. 1.183-2(b)(5), Income Tax Regs. Conversely, *371 the lack of such experience does not necessarily indicate that the activity was not engaged in with the objective to make a profit. Pirnia v. Commissioner, supra.
Petitioner had not engaged in a similar activity for profit, but had engaged in other successful activities. Respondent argues that factor does not help petitioner because petitioner's successful activities were not similar to his horse operations. We disagree. Petitioner's success in other business activities may indicate a profit motive. See Ellis v. Commissioner, T.C. Memo. 1984-50 (taxpayer's success in his unrelated accounting business strengthened his contention that he ran his horse operations for profit). This factor favors petitioner. 6. Taxpayer's History of Income or Losses
A history of substantial losses may indicate that the activity was not conducted for profit. Golanty v. Commissioner, 72 T.C. at 427; sec. 1.183-2(b)(6), Income Tax Regs. However, a taxpayer may have a profit objective even when the activity has a history of losses without any profit. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), *372 affd. 379 F.2d 252 (2d Cir. 1967). Respondent contends that petitioner's horse operation losses beginning in 1981 show that petitioner lacked a profit objective and that these losses were not sustained because of unforeseen circumstances beyond petitioner's control. While it is true that petitioner did not recognize a profit during the years in issue, a series of losses during the initial stage of an activity does not necessarily indicate that the activity was not engaged in for profit. Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs. Losses sustained because of unforeseen or fortuitous circumstances beyond the taxpayer's control do not indicate lack of a profit objective. Sec. 1.183-2(b)(6), Income Tax Regs.
In Engdahl v. Commissioner, supra, the taxpayer had losses for over 11 years from 1964 to 1975. We found that the losses occurred during the initial stage of the horse-breeding operation and thus did not indicate a lack of profit objective. In this case, petitioner estimated in his business plan that it would take from 7 to 10 years to establish *373 his breeding program. Nuhn supported this estimate with his testimony that it takes approximately 5 to 6 years to establish a breeding program. Petitioner had major setbacks when Man on Deck and Mariners Pride became unable to race. We believe that petitioner had losses in his horse operations for a reasonable period under these circumstances. This factor is neutral. 7. Amount of Occasional Profits, if Any
Small occasional profits with large continuous losses do not indicate a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. However, an opportunity to earn a substantial ultimate profit in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit even though only losses are generated. Sec. 1.183-2(b)(7), Income Tax Regs. Branca and Nuhn testified that petitioner's horse activity was highly speculative. We agree. This factor is neutral. 8. Financial Status of the Taxpayer
Substantial income from sources other than the activity, especially if the losses generate substantial tax benefits, may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioner had substantial *374 income to absorb the losses. This factor favors respondent. 9. Elements of Personal Pleasure
A taxpayer's enjoyment of an activity does not demonstrate a lack of profit objective if the activity is, in fact, conducted for profit as shown by other factors. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs.
Respondent concedes that petitioner did not receive any personal pleasure from his horse breeding and racing activity. This factor favors petitioners. We conclude that petitioner engaged in horse breeding and racing for profit because throughout the years in question petitioner's primary interest in racing and breeding horses was not personal; he conducted the activity professionally; he constantly consulted and relied on experts; and he adjusted his business plan in response to changed circumstances. Decision will entered under Rule 155. Footnotes
1. Fifty percent of the interest payable under sec. 6601 with respect to the portion of the underpayment attributed to negligence; i.e., $ 76,298 for 1986 and $ 12,238 for 1987.↩