T.C. Memo. 2014-233

UNITED STATES TAX COURT

MEL A. ANNUZZI AND JEAN L. ANNUZZI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21710-12.                    Filed November 13, 2014.

<u>Richard Warren Craigo</u> and <u>Bertram P. Husband</u>, for petitioners.

<u>Nicole C. Lloyd</u> and <u>Michael K. Park</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  The Internal Revenue Service (IRS or respondent) deter-
mined deficiencies in petitioners' 2009 and 2010 Federal income tax of $27,130
and $23,951, respectively.  The question presented is whether petitioners'

[*2] thoroughbred activity constituted "an activity not engaged in for profit" within the meaning of section 183.[1] We answer this question in petitioners' favor.

FINDINGS OF FACT

The parties filed a stipulation of facts and accompanying exhibits that are incorporated by this reference. Petitioners resided in California when they petitioned this Court.

Petitioners, Mel and Jean Annuzzi, operate Annuzzi Concrete Services, Inc. (ACS), in San Francisco, California. Mel has been the president of ACS for more than two decades. Jean works at ACS part time and has principal responsibility for the company's finances, including bookkeeping and accounting. Petitioners have built ACS into a business sufficiently profitable to pay Mel a salary of $1,182,698 in 2009 and $854,897 in 2010.

Mel was introduced to thoroughbred horse racing by his uncle sometime in the 1970s. In the early 1980s petitioners began to purchase race horses, and they expanded their thoroughbred activity substantially during the next decade. Petitioners focus exclusively on horse racing. They do not own or ride horses for pleasure; they do not allow anyone other than qualified professionals to ride their

---

[1]All statutory references are to the Internal Revenue Code in effect for the tax years at issue. We round all monetary amounts to the nearest dollar.

[*3] horses; they do not show their horses; they own no farm; and they do not keep horses as pets. Simply put, petitioners race their horses. They hope to make money by winning purses at horse races, by selling race horses at a profit, and by breeding foals that they can race successfully or sell.

Since 1981 petitioners have coowned most of their horses with Terry Knight, sharing income and expenses as described below. Mr. Knight is a second-generation, professional thoroughbred trainer licensed with the California Horse Racing Board. He sits on the board of the California Thoroughbred Trainers Association and has been extremely successful in training race horses. The horses he has trained have won at the Monrovia Handicap, the Pocahontas Stakes, the Hollywood Turf Race, and the Matchmaker Stakes, earning purses ranging from $100,000 to $500,000. Mr. Knight trained Publication, a horse that one of his clients bought for $22,000 and sold for $700,000, and Honor System, a horse that another of his clients bought for $50,000 and sold for $400,000. The horses that Mr. Knight trained have earned almost $12.7 million.

Mr. Knight has coowned more than 50 horses with petitioners. Whenever Mr. Knight had an ownership interest in one of petitioners' horses, it was reflected on the official State of California registration for the horse, which resembles a title

[*4] document.  In most cases Mr. Knight had a 50% ownership interest in the horse and petitioners had a 50% ownership interest.

Where ownership of a horse was split 50-50, Mr. Knight paid 50% of the expenses for upkeep of that horse.  Mr. Knight trained virtually all of petitioners' horses.  Where ownership of a horse was split 50-50, Mr. Knight invoiced petitioners for 50% of his usual training fee; the other 50% of the training fee was allocable to Mr. Knight's own interest in the horse.  When a horse won a purse, Mr. Knight received 10% of the purse as the customary trainer's fee.  He and petitioners then split the balance of the purse.

During 1981-2000 petitioners and Mr. Knight mainly purchased "claiming horses" and focused on "claiming races."  A "claiming race" is one in which a participating horse can be purchased (claimed) for a specified sum that must be deposited before the race.  This approach afforded petitioners and Mr. Knight the benefit of a quick turnaround:  The horses they purchased could be raced immediately, with the hope that they would win purses or be "claimed away" in a future race at a higher price.

In 2001 petitioners and Mr. Knight changed their approach and stopped buying horses from claiming races.  Instead, they began purchasing young, unraced horses from Barretts Equine Sales in Pomona, California.  Petitioners'

**[\*5]** expert, Rollin Baugh, credibly testified that petitioners and Mr. Knight chose their horses wisely, investing in "the sons and daughters of some of California's best stallions."

During 2001-2003 petitioners and Mr. Knight purchased ten horses at an average cost of $7,759. In 2004 they further modified their business plan by shifting to the purchase of finer quality horses, which they believed would have a better chance of winning larger purses. During 2004-2010 petitioners and Mr. Knight purchased 25 horses at an average cost of $11,692. This new strategy met with some success. Since 2008, two horses coowned by petitioners and Mr. Knight have earned more than $100,000, and five other horses coowned by petitioners and Mr. Knight have earned more than $20,000.

In 2007 petitioners and Mr. Knight again adjusted their business plan by putting greater emphasis on breeding horses. One of their fillies, Fast and Fair, had raced successfully before suffering an injury. Petitioners and Mr. Knight were convinced that she had the right musculature, bone structure, pedigree, and proportions to produce fast offspring. Mr. Knight winnowed the field of potential mates and chose the most impressive stallions.

Fast and Fair gave birth to Minimizethedamage in 2008, Pork Chop in 2009, and Decent Dude in 2010. Minimizethedamage earned a $21,840 purse by win-

[*6] ning her debut race in 2011. Decent Dude initially raced in 2012 and took third place at Hollywood Park. Shortly thereafter, petitioners and Mr. Knight were offered $150,000 for Decent Dude but declined the offer because they thought he had the potential to win even larger purses. That turned out to be an unfortunate decision; Decent Dude subsequently shattered a sesamoid, part of the ankle, and never raced again.

Petitioners were offered substantial sums, not only for Decent Dude but also for other horses. In 1988 petitioners were offered $225,000 for Base Camp, which they coowned with Mr. Knight. Petitioners had claimed Base Camp for $8,000, so they had a potential profit of $217,000 on this horse. In consultation with Mr. Knight, they declined this offer because Base Camp was rated a favorite in upcoming races for bigger stakes. Petitioners were later offered $150,000 for Two Trails, a horse they and Mr. Knight had purchased in 2005 for $16,000.

Two factors adversely affected the profitability of petitioners' thoroughbred activity during the tax years at issue. The first was their decision to put greater emphasis on breeding foals, which generates current expenses but necessarily defers income. Under California regulations, a horse is generally not allowed to race until it is two years old. Even after reaching that milestone, a horse may not be physically ready to race. Although Fast and Fair and other broodmares gave

[*7] birth to promising foals between 2007 and 2010, none of them could race during the tax years at issue because they were too young.

The second factor was the introduction of synthetic turf at most California race tracks pursuant to a mandate from the California Horse Racing Board. Golden Gate Fields, where petitioners' horses trained, implemented this mandate in 2007. The horses struggled on the synthetic surface, and Mr. Knight credibly testified that it led to injuries that incapacitated between 30% and 40% of the horses he coowned with petitioners.

In 2007 High and Hot suffered a bowed tendon, which occurs when a horse's foreleg flexor tendon is torn and heals in a bowed shape. Petitioners sold him for $1 after a veterinarian determined the injury was career ending. In 2008 petitioners discarded Humidity after she suffered a slab fracture in her knee. In 2009 petitioners discarded Case Study after he severely injured his foreleg suspensory ligament, and they discarded Our Superstar after an unsuccessful surgery on his cannon bone. Mr. Knight credibly testified that such a high percentage of injuries in such a short time is anomalous in the thoroughbred industry. Petitioners' practices in 2007-2009 were consistent with their usual practice of consulting with Mr. Knight and culling unproductive horses.

**[*8]**   Mel estimated that he spent 30 hours per week on the thoroughbred activity. He reviewed sales previews and catalogs of horses available for purchase, reviewed daily racing forms, consulted with Mr. Knight about purchasing and breeding horses, and participated in negotiations concerning both.  At the racetrack Mel watched his horses train, attended all races in which they raced, and scouted out the competition.  Mr. Knight devoted 10-16 hours a week to training petitioners' horses and additional time to consultations with petitioners about buying, breeding, and selling thoroughbreds.

Jean kept the books and records of the thoroughbred activity and regularly reviewed them with her husband.  These records included spreadsheets for each horse showing the original cost, all expenses incurred (e.g., for boarding, training, and veterinarians), all purses won (including the race and date), and all foals or breeding activity.  Expenses paid were identified by date, check number, and payment amount.  At yearend Jean summarized the checks and receipts on a spreadsheet, which she provided to their accountant for tax return preparation.

Jean estimated that she devoted 25-30 hours a week to these recordkeeping activities.  She did not prepare written business plans or formal cashflow projections for the thoroughbred activity.  But she testified that petitioners did not prepare written business plans or formal cashflow projections for ACS either.

[*9] Jean further testified that petitioners considered insuring their horses against injury but decided against it because the available insurance products were too expensive.

Petitioners boarded their horses at high-quality stables and employed high-quality veterinarians to care for them. They watched horse races on television almost daily. They subscribed to two channels that broadcast horse races from all over the world. They traveled annually to the Del Mar Thoroughbred Club for vacations during July and August. While there, they visited the track every morning, attended races every afternoon, and discussed horse racing with Mr. Knight every evening. Petitioners also traveled to Las Vegas, where they would watch the Kentucky Derby and discuss races with Mr. Knight.

Between 1981 and 1994 petitioners had some success in their thoroughbred activity, earning modest profits in 1983, 1984, 1987, 1988, and 1994. Petitioners and Mr. Knight owned no horses together in 1985 or 1986 because petitioners' horses had been claimed away and Mr. Knight had left California temporarily. Petitioners suffered annual losses from 1995 through the tax years at issue, as shown in the following table:

| [*10] Year | Net profit or loss |
|------------|--------------------|
| 1981 | ($1,983) |
| 1982 | (10,644) |
| 1983 | 401 |
| 1984 | 555 |
| 1985 | -0- |
| 1986 | -0- |
| 1987 | 24,175 |
| 1988 | 3,378 |
| 1989 | (11,031) |
| 1990 | (2,178) |
| 1991 | (4,601) |
| 1992 | (7,059) |
| 1993 | (2,977) |
| 1994 | 1,862 |
| 1995 | (20,411) |
| 1996 | (6,100) |
| 1997 | (16,978) |
| 1998 | (1,483) |
| 1999 | (10,634) |
| 2000 | (17,565) |
| 2001 | (5,794) |
| 2002 | (46,161) |
| 2003 | (50,696) |

| [*11] 2004 | (72,321) |
|------|------|
| 2005 | (25,379) |
| 2006 | (23,859) |
| 2007 | (49,429) |
| 2008 | (57,349) |
| 2009 | (81,114) |
| 2010 | (55,797) |

Petitioners believed that they could eventually generate profits from their thoroughbred activity by breeding their best horses and racing the most promising foals. Mr. Knight, on the other hand, could not afford to risk further losses. Beginning in 2010 he declined to share in the purchase price of any new horses. He continues to own his share of the horses he had previously purchased with petitioners as well as his share of the foals delivered by the broodmares he coowns with them. Mr. Knight trained petitioners' horses throughout the tax years at issue and apparently continues to do so.

The IRS determined that petitioners during 2009 and 2010 did not engage in their thoroughbred activity with the intent to make a profit. For 2009 petitioners reported gross receipts of $4,825 and expenses of $76,745, for a tentative loss of $71,920. For 2010 petitioners reported gross receipts of $31,795 and expenses of $85,176, for a tentative loss of $53,381. Petitioners also reported on Form 4797,

**[\*12]** Sale of Business Property, losses of $9,194 and $2,146, respectively, from the sale of several horses. When these losses are added to the tentative losses, petitioners had total net losses of $81,114 and $55,797 for 2009 and 2010, respectively. The IRS disallowed deductions for these losses, invoking section 183, and petitioners timely sought redetermination in this Court of the resulting deficiencies.

OPINION

I.      Governing Statutory Framework

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." To be entitled to deductions under this section, taxpayers must show that they engaged in the activity with an actual and honest objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 392 (1988). If an activity is not engaged in for profit, deductions attributable thereto are allowed only to the extent that the gross income derived therefrom exceeds the deductions allowable without regard to whether the activity was engaged in for profit. Sec. 183(a) and (b). Thus, losses are not allowable for an activity that taxpayers carry on primarily for sport, as a hobby, or for recreation. Sec. 1.183-2(a), Income Tax Regs.

**[\*13]** Petitioners resided in California when they filed their petition, so an appeal of this case, absent stipulation to the contrary, would lie to the Court of Appeals for the Ninth Circuit. See sec. 7482(b)(1)(A); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). That court has held that a taxpayer can escape the section 183(a) bar on deductibility only by demonstrating that his predominant, primary, or principal objective in engaging in the activity was to realize an economic profit independent of tax savings. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212.

We determine whether the taxpayer has the requisite intent to earn a profit on the basis of all the facts and circumstances. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs. While this analysis requires consideration of the taxpayer's subjective intent, we also examine objective indicia of his motivation. Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), aff'g Lahr v. Commissioner, T.C. Memo. 1984-472, 48 T.C.M. (CCH) 1029 (1984); see also sec. 1.183-2(a), Income Tax Regs. We accord greater weight to objective facts than to subjective statements of intent. Keanini v.

**[\*14]** <u>Commissioner</u>, 94 T.C. 41, 46 (1990); sec. 1.183-2(a), Income Tax Regs.;

<u>see</u> <u>Indep. Elec. Supply, Inc. v. Commissioner</u>, 781 F.2d at 726.[2]

## II.     Intent To Earn a Profit

The parties agree that petitioners' horse-related activities, including pur-

chasing, breeding, and racing horses, should be analyzed under section 183 as a

single activity.  <u>See</u> sec. 1.183-1(d), Income Tax Regs.  The regulations set forth a

nonexclusive list of nine factors relevant in ascertaining whether a taxpayer con-

ducts an activity with the intent to earn a profit.  The factors listed are:  (1) the

manner in which the taxpayer conducts the activity; (2) the expertise of the tax-

payer or his advisers; (3) the time and effort spent by the taxpayer in carrying on

the activity; (4) the expectation that assets used in the activity may appreciate in

value; (5) the success of the taxpayer in carrying on other similar or dissimilar

activities; (6) the taxpayer's history of income or losses with respect to the

activity; (7) the amount of occasional profits, if any; (8) the financial status of the

taxpayer; and (9) elements of personal pleasure or recreation.  Sec. 1.183-2(b),

Income Tax Regs.

---

[2]Because we decide this case on a preponderance of the evidence, we need not decide which party has the burden of proof.  <u>See, e.g.</u>, <u>Estate of Turner v. Commissioner</u>, 138 T.C. 306, 309 (2012).

[*15] No factor or group of factors is controlling, nor is it necessary that a majority of factors point to one outcome.  See Keating v. Commissioner, 544 F.3d 900, 904 (8th Cir. 2008), aff'g T.C. Memo. 2007-309; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979) (stating that taxpayer's profit objective must be ascertained "not on the basis of any one factor but on the basis of all the facts and circumstances"); sec. 1.183-2(b), Income Tax Regs.  Certain factors may be accorded more weight in a particular case because they have greater salience or persuasive value as applied to its facts.  See Vitale v. Commissioner, T.C. Memo. 1999-131, 47 T.C.M. (CCH) 1869, 1874 (1999), aff'd without published opinion, 217 F.3d 843 (4th Cir. 2000); Green v. Commissioner, T.C. Memo. 1989-436, 57 T.C.M. (CCH) 1333, 1343 (1989) (noting that all nine factors do not necessarily apply in every case).

      1.     Manner in Which Activity Is Conducted

Conducting an activity in a businesslike manner may show that the taxpayer intends to earn a profit from it.  Sec. 1.183-2(b)(1), Income Tax Regs.  Facts evidencing a businesslike manner may include the taxpayer's maintenance of complete and accurate books and records; the taxpayer's conduct of the activity in a manner resembling that in which successful practitioners conduct similar business activities; and the taxpayer's change of operating procedures, adoption of new

**[*16]** techniques, or abandonment of unprofitable activities in a manner consistent with a desire to improve profitability. Giles v. Commissioner, T.C. Memo. 2006-15; sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners kept thorough and accurate records of their thoroughbred activity. Jean maintained detailed spreadsheets that enabled petitioners to determine the profitability of each horse on the basis of its original cost, expenses of training and upkeep, purses won, and potential for breeding. Petitioners used these records, in consultation with Mr. Knight, to reduce losses by culling unprofitable horses. If a horse became injured or raced poorly, petitioners disposed of that horse unless it had significant breeding potential.

While not challenging the adequacy of petitioners' records, respondent contends that the absence of a written business plan and formal cashflow projections shows that they did not act in a businesslike manner. Although petitioners did not have a written business plan, they had a business plan and pursued it consistently. See Dishal v. Commissioner, T.C. Memo. 1998-397, 76 T.C.M. (CCH) 793, 795 (1998); Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C.M. (CCH) 2296, 2300 (1997) (stating that written financial plan not required for 32-horse farm where business plan was evidenced by action). Petitioners developed their business plan in conjunction with Mr. Knight, an expert horse trainer. Their

[*17] joint business plan was evidently satisfactory to Mr. Knight, who clearly intended to derive a profit from his horse-related activity.

The evidence established that formal cashflow projections for a horse racing business would be speculative. It is nearly impossible to predict whether a particular horse, however promising, will finish first, second, or third in future races. It is equally difficult to predict whether a promising horse will suffer an injury that will suddenly end its moneymaking career. Petitioners established that they were able to run ACS, a profitable concrete business, without a written business plan or formal income projections. Their decision to forgo the creation of such documents for their thoroughbred activity does not evidence the lack of a profit objective.

Petitioners conducted their thoroughbred activity in the same manner as other successful practitioners. See sec. 1.183-2(b)(1), Income Tax Regs. Indeed, they coowned most of their horses with Mr. Knight, a highly successful thorough-bred practitioner. Mr. Knight trained horses for a living, and petitioners made all decisions about purchasing, training, selling, and breeding their horses in consultation with him. Petitioners had a brief hiatus in their thoroughbred activity during 1985 and 1986, when Mr. Knight left California temporarily. This shows how integral he was to their business plan.

[*18] Petitioners' expert, Mr. Baugh, testified that good managers in the thoroughbred business "watch their competition and are consistently evaluating their inventory." The record establishes that petitioners followed this maxim. They constantly observed races, studied sales catalogs, and purchased in consultation with Mr. Knight the "sons and daughters of some of California's best stallions." Further evidence of petitioners' managerial skill, in Mr. Baugh's view, was their "willingness to sell unproductive horses." Petitioners did not have nostalgic attachment to their horses, as people commonly have to their pets. If a horse suffered a career-ending injury or began to race poorly, petitioners cut their losses by disposing of that horse.

Petitioners also changed their operating procedures "in a manner consistent with an intent to improve profitability." See id. Petitioners and Mr. Knight made several major adjustments to their business plan over time. They initially purchased "claiming horses" and focused mainly on claiming races. They shifted to higher priced horses in 2001, paying an average price of $7,759 for horses purchased between 2001 and 2003. They upgraded their inventory again in 2004, paying an average price of $11,692 for horses purchased between 2004 and 2010. Petitioners made these modifications in an effort to make their thoroughbred

[*19] activity more profitable by acquiring horses that could credibly compete for significantly larger purses.

In 2007 petitioners and Mr. Knight made a further change to their operating procedures by placing greater emphasis on breeding horses. This latter change to their business plan was successful, resulting in the birth of foals with excellent potential for earning profits. See, e.g., Arwood v. Commissioner, T.C. Memo. 1993-352, 66 T.C.M. (CCH) 340, 344 (1993) (finding that taxpayers' adjusting their operations by acquiring broodmares to breed foals indicated a profit objective).

Respondent notes that petitioners did not carry insurance on their horses even though horse racing is an inherently risky business. Jean testified credibly that petitioners considered insuring their horses against injury but decided against it because the available insurance products were too expensive. Mr. Knight, an experienced horse trainer who coowned most of the horses, concurred in this judgment. Petitioners and Mr. Knight ultimately lost a large number of horses during 2007-2009, an "anomalous" level of losses that Mr. Knight later attributed to the installation of artificial turf at California race tracks. Although petitioners' decision to forgo the purchase of insurance may have been imprudent, it was a calculated business decision and it does not evidence the lack of a profit objective.

[*20] All in all, we conclude that petitioners conducted their thoroughbred activity in a businesslike manner. Each of the elements we have discussed indicates that they had the requisite profit objective. We find this first factor important to our analysis, and it strongly favors petitioners.

2.      Expertise of the Taxpayers or Their Advisers

A taxpayer's preparation for an activity "by extensive study of its accepted business, economic, and scientific practices" may indicate a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs.; see Burger v. Commissioner, T.C. Memo. 1985-523, 50 T.C.M. (CCH) 1266, 1271 (1985) (citing Golanty v. Commissioner, 72 T.C. at 432), aff'd, 809 F.2d 355 (7th Cir. 1987). Petitioners began their thoroughbred activity in 1981 and during the ensuing decades developed considerable expertise in it. They immersed themselves in all aspects of the business: studying sales catalogs and the Daily Racing Form, purchasing horses from claiming races and at auction, purchasing or breeding broodmares to produce foals, and spending many hours at the track watching their horses train.

A taxpayer's "consultation with those who are expert" in a particular activity may likewise indicate a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioners constantly sought and received advice from Mr. Knight, an indisputable expert in thoroughbred racing. The consistency of petitioners' reliance on

**[*21]** him is shown by the hiatus in their thoroughbred activity during 1985 and 1986, when he left California temporarily and was unable to train their horses. Not only did petitioners seek Mr. Knight's expert advice; they also purchased most of their horses in conjunction with him. Coownership of thoroughbreds with an expert trainer suggests a profit objective.

While agreeing that Mr. Knight is a "competent horse trainer who has been involved in the thoroughbred business for years," respondent contends that his expertise involves training horses, not increasing profitability. But petitioners and their expert trainer do not need economics degrees to know how to make money from buying, racing, and selling horses. See Freed v. Commissioner, T.C. Memo. 2004-215, 88 T.C.M. (CCH) 288, 291 (2004) ("Petitioner does not need advanced training in economics to know that a thoroughbred horse that wins races is more valuable than one that does not.").

Mr. Knight is a second-generation thoroughbred trainer with an impressive record. During his career the horses he has trained have earned almost $12.7 million. He certainly understands how to make money in the thoroughbred racing industry: buy promising horses, breed foals from high-quality stock, train the horses well, win races for purses, and sell underperforming horses. There is no

[*22] reason to believe that Mr. Knight would have purchased horses with petitioners unless they had, in his expert view, the potential to earn significant income.

Mr. Knight was not an expert who consulted episodically or from afar. He worked diligently with petitioners, in a hands-on fashion for 25 years, to acquire, breed, race, and sell high-quality horses. The essential thrust of petitioners' business plan was to leverage Mr. Knight's expertise to help them win large purses. We find this second factor to be important in our analysis, and overall it strongly favors petitioners.

### 3. Taxpayers' Time and Effort

A taxpayer's devotion of considerable time and effort to an activity may indicate a profit motive, "particularly if the activity does not have substantial personal or recreational aspects." Giles v. Commissioner, T.C. Memo. 2006-15; sec. 1.183-2(b)(3), Income Tax Regs. In some instances, devoting two to four hours daily and more time on weekends may be sufficient to demonstrate a profit objective. See Givens v. Commissioner, T.C. Memo. 1989-529, 58 T.C.M. (CCH) 255, 259 (1989). Mel and Jean both performed substantial services for ACS, but "a taxpayer may engage in more than one trade or business at any one time." See Storey v. Commissioner, T.C. Memo. 2012-115, 103 T.C.M. (CCH) 1631, 1637

**[*23]** (2012) (finding that taxpayer, a law firm partner billing up to 35 hours a week for legal work, engaged in her film production business with the intent to earn a profit). Even where a taxpayer himself devotes limited time to an activity, a profit motive may be indicated if he "employs competent and qualified persons to carry on the activity." Sec. 1.183-2(b)(3), Income Tax Regs.

Petitioners estimated that they jointly devoted to their thoroughbred activity between 55 and 60 hours a week. Given their significant responsibilities at ACS, these uncorroborated estimates struck the Court as high. And many of the activities in question--attending horse races, watching races on television, visiting the race track while their horses trained, and discussing racing with Mr. Knight at Del Mar Thoroughbred Club--had "substantial personal * * * [and] recreational aspects." See id.

On the other hand, petitioners did employ highly competent professionals to assist them. First and foremost was Mr. Knight; he devoted 10-16 hours a week to training petitioners' horses and additional time to consultations about buying, breeding, and selling thoroughbreds. As coowner of most of petitioners' horses, Mr. Knight surely had an incentive to devote to their training and maintenance the time that was required. Other professionals that petitioners employed also appear to have been competent. They boarded the horses at high-quality stables, trained

**[\*24]** them on high-quality tracks, and employed high-quality veterinarians to care for them. Mainly because of Mr. Knight's intense involvement, we conclude that this third factor favors petitioners, but only slightly.

    4.    <u>Expectation of Appreciation in Value</u>

An expectation that assets used in the activity will appreciate in value may indicate a profit motive. Sec. 1.183-2(b)(4), Income Tax Regs. Even if a taxpayer derives no profit from current operations, he may anticipate an overall profit when asset appreciation is factored in. <u>Ibid.</u> Such an expectation becomes less speculative when a taxpayer shows successes that could plausibly lead to appreciation. <u>Cf.</u> <u>Tinnell v. Commissioner</u>, T.C. Memo. 2001-106, 81 T.C.M. (CCH) 1569 (2001); <u>Hoyle v. Commissioner</u>, T.C. Memo. 1994-592, 68 T.C.M. (CCH) 1321 (1994).

Horses can appreciate in value in two ways. They can develop well and race better, winning larger purses. And as they near the end of their racing careers, they can generate income from breeding foals or earning stud fees. Even if a horse suffers a career-ending injury, it may appreciate in value because of its genetic material and reproductive potential.

The average cost of the horses petitioners acquired between 2001 and 2003 was $7,759, and the average cost of the horses they acquired between 2004 and

**[\*25]** 2010 was $11,692. Since 2008, two of their horses have earned more than $100,000, and five others have earned more than $20,000. Petitioners also received offers to purchase three of their horses at prices that would have generated substantial profits. Petitioners were offered $225,000 for Base Camp, which they had claimed for $8,000. They were offered $150,000 for Two Trails, which they had purchased for $17,000. And they were offered $150,000 for Decent Dude, which they had bred from Fast and Fair, a very promising horse that had suffered an early-career injury. Given their relatively low acquisition costs, the good bloodlines of their horses, and the expert training that Mr. Knight provided, petitioners could--and did--expect to realize significant appreciation in the value of their thoroughbred assets. Cf. Hoyle v. Commissioner, 68 T.C.M. (CCH) at 1328-1329 (finding that lawyer engaged in farming activity had expectation that farmland would appreciate in value). We conclude that this factor points fairly strongly in petitioners' favor.[3]

5.     Taxpayers' Success in Other Activities

A track record of success in other business ventures may indicate that the taxpayer has the entrepreneurial skills and determination to succeed in subsequent

---

[3]Petitioners ask us to take judicial notice of the fact that California Chrome, the 2014 winner of the Kentucky Derby, is the half-brother of a filly born to Fast and Fair. On the record before us, we decline to do so.

[*26] endeavors. This in turn may imply that the taxpayer, when embarking on these endeavors, does so with the expectation of making a profit. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners assert that their extraordinary success in growing their concrete business points this factor in their favor. But prior success in business does not necessarily imply a profit objective for a new activity that might be a hobby or sport; indeed, this will be the pattern in most section 183 cases. There is little synergy between petitioners' concrete business and their thoroughbred activity; entrepreneurial skills do not appear central to success in horse racing; and there is no evidence that petitioners are "turnaround experts" skilled at reforming a losing business into a profitable one. Compare Roberts v. Commissioner, T.C. Memo. 2014-74, at *34-*35 (finding this factor to favor taxpayer who turned single unprofitable bar into network of successful establishments), with Easter v. Commissioner, T.C. Memo. 1992-188, 63 T.C.M. (CCH) 2590, 2595 (1992) (finding record devoid of evidence of taxpayer's past efforts to convert unprofitable business into profitable one). We find this factor neutral here.

6. History of Income or Losses

When a taxpayer incurs a series of losses beyond an activity's startup years, the continued losses may imply the absence of a profit objective. Sec. 1.183-

**[\*27]** 2(b)(6), Income Tax Regs. This inference may not arise where losses are due to "customary business risks or reverses" or to "unforeseen or fortuitous circumstances which are beyond the control of the taxpayer." Ibid.

The tax years at issue lie well beyond the startup phase for petitioners' thoroughbred activity, which they commenced in 1981. See Engdahl v. Commissioner, 72 T.C. at 669 (stating that startup phase for horse-related activity may be five to ten years). This activity has generated continuous losses since 1995. The losses were relatively modest during the 1990s and early 2000s, averaging $8,052 annually from 1989 through 2001. In 2001 petitioners and Mr. Knight began buying yearlings, which need at least a year before they can race. In part for that reason, petitioners' losses increased during 2002-2007, averaging $44,640 annually. In 2007 petitioners and Mr. Knight began placing increased emphasis on breeding foals, which could not race for at least two years. Their losses again increased substantially during 2008-2010, averaging $64,753 annually.

This is not an impressive track record, but three facts mitigate the negative implications that might be drawn from it. First, petitioners' losses during 2007-2009 were exacerbated by injuries to several promising horses, apparently trace-able to the 2007 switch to artificial turf at most California racetracks. Mr. Knight

**[\*28]** credibly testified that this synthetic turf caused petitioners to lose 30% to 40% of their horses, a loss ratio that he termed anomalous in the thoroughbred business. See Roberts v. Commissioner, at \*36 (finding that untimely deaths of several racing and breeding prospects explained in part a string of large losses); Chandler v. Commissioner, T.C. Memo. 2010-92, 99 T.C.M. (CCH) 1376, 1379 (2010) (recognizing that horse breeding and racing are speculative activities where death or injury to horses is common), aff'd, 481 Fed. Appx. 400 (9th Cir. 2012); Dishal v. Commissioner, 76 T.C.M. (CCH) at 796 (finding taxpayers' losses "were in part due to unforeseen and unfortunate circumstances beyond their control which abruptly ended the racing careers, and in some instances the lives, of several of their horses").

Second, petitioners' shift in 2007 to a significantly higher level of breeding activity necessarily increased current expenses while deferring income. Although the foals so produced had substantial promise, they could not race for at least two years. In this respect, petitioners' business during 2008-2010 was in a phase analogous to a startup period, during which losses are expected.

Third, petitioners received six-figure offers for three of their horses. Had they accepted these offers, they would have had profits for those years and gone a long way toward eliminating their cumulative losses. While in hindsight the

[*29] decisions to reject these offers may have been unfortunate, they were rational business judgments that are not inconsistent with an intent to derive a profit from the thoroughbred activity.

Overall, this sixth factor weighs in respondent's favor because petitioners have had many years of continuous losses. But no one factor is determinative of a taxpayer's profit objective. See Engdahl v. Commissioner, 72 T.C. at 666. In light of our discussion above, we are convinced that these losses do not negate petitioners' actual and honest intent to profit from their thoroughbred activity.

7.    Amount of Occasional Profits

A taxpayer's derivation of some profits from an otherwise money-losing venture may support the existence of a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs. Moreover, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Ibid. The regulations cite a wildcat oil drilling venture as an example of an activity in which an honest profit motive may be founded on "a small chance that * * * [the taxpayer] will make a large profit." Sec. 1.183-2(c), Example (5), Income Tax Regs. We have previously described a horse-related activity as a highly speculative venture, likening it to drilling a wildcat oil well.

[*30] See Dawson v. Commissioner, T.C. Memo. 1996-417, 72 T.C.M. (CCH) 624, 627 (1996) (finding that taxpayer's belief that a champion horse could generate substantial profits supported the existence of a profit objective).

Petitioners' thoroughbred activity was highly speculative and has been profitable for only five of the past 30 years. But this activity did give petitioners a real chance to earn a substantial profit. Mr. Knight, a savvy and experienced horse trainer, thought enough of the income potential of these horses to become a coowner of most of them. Petitioners received offers totaling $525,000 to purchase three of their thoroughbreds--Decent Dude, Base Camp, and Two Trails. Given the scale of petitioners' operations, we regard the potential to realize $525,000 on just three horses as a real opportunity to earn a substantial profit. See Johnston v. Commissioner, T.C. Memo. 1997-475, 74 T.C.M. (CCH) 968, 978 (1997) (finding that taxpayers' steeplechase training and racing operation provided a real opportunity to earn substantial profits because the trained horses would compete for large purses); cf. Tinnell v. Commissioner, 81 T.C.M. (CCH) at 1579 (finding that potential to generate significant income from highly speculative mining activity indicated a profit objective).

The record supports petitioners' belief that Mr. Knight possessed the expertise to produce winning thoroughbreds. As coowner of these horses he bore half

**[\*31]** the expenses of their maintenance; he thus had every incentive to train them well. Mr. Knight ultimately decided, in 2010, that he would not share in the ownership of any new horses because he could not afford to risk further losses. But he believed from the outset that this would be a profitable endeavor, and there is no evidence to suggest that his motivation was anything other than to make a profit.

Petitioners have yet to win a purse exceeding $100,000. But that is exactly the nature of a speculative business--its outcomes are uncertain. Despite the minimal profits that petitioners have earned from their thoroughbred activity over the years, we conclude that this seventh factor favors them slightly.

8.    Taxpayers' Financial Status

The fact that a taxpayer derives substantial income or capital from sources other than the activity may indicate that he does not engage in the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs. This is especially true "if there are personal or recreational elements involved" and if "the losses from the activity generate substantial tax benefits." Ibid. But the receipt of tax benefits, standing alone, does not establish that the taxpayer lacks a profit objective. See Engdahl v. Commissioner, 72 T.C. at 670; McKeever v. Commissioner, T.C. Memo. 2000-288.

[*32] Petitioners' concrete business was quite profitable, enabling Mel to derive an annual salary averaging about $1 million during the tax years at issue. The losses flowing from petitioners' thoroughbred activity generated substantial tax benefits. And as discussed below, petitioners derived considerable pleasure from the recreational aspects of this activity. All in all, this eighth factor strongly favors respondent.

9. Elements of Personal Pleasure

Evidence that a taxpayer derives personal pleasure from an activity, or finds it recreational, may suggest that he engages in it for reasons other than making a profit. See sec. 1.183-2(b)(9), Income Tax Regs. The derivation of personal pleasure, however, "is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors." Ibid. "[A] business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972); see also Giles v. Commissioner, T.C. Memo. 2006-15. But if the chance for profit is small relative to the potential for gratification, the latter may emerge as the primary motivation. See White v. Commissioner, 23 T.C. 90, 94 (1954), aff'd per curiam, 227 F.2d 779 (6th Cir. 1955).

[*33] Petitioners did not own or ride horses for pleasure. They did not let anyone other than qualified professionals ride their horses. They did not own a horse farm. They did not show their horses and did not keep horses as pets. Facts such as these may favor the taxpayer. See Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C.M. (CCH) 2296, 2305 (1997) (concluding that taxpayers rode their horses solely to prepare them to race, for sale, or for show, and did not engage in the horse activity for its recreational or personal aspects); Shane v. Commissioner, T.C. Memo. 1995-504, 70 T.C.M. (CCH) 1052, 1056 (1995) (concluding that taxpayer derived no more enjoyment from horse activity than one would derive from any entrepreneurial undertaking).

On the other hand, petitioners clearly derived immense pleasure from their thoroughbred activity. They took regular vacations to the Del Mar Thoroughbred Club, visiting the track every morning and attending races every afternoon, and they traveled annually to Las Vegas to watch the Kentucky Derby on the big screen.[4] They watched their horses train almost daily. They enjoyed conversation

---

[4]The record does not indicate whether petitioners claimed deductions on their Schedules C, Profit or Loss From Business, for travel, hotel, and related expenses incident to these trips. Respondent does not advance, as an alternative to his section 183 argument, the contention that certain of petitioners' expenses were not "ordinary and necessary [business] expenses" within the meaning of section 162(a).

[*34] with fellow owners at the track and in other social settings. They did devote many hours to mundane activities like recordkeeping. But activities that might seem mundane to some--such as reviewing sales catalogs, negotiating purchases, and discussing horse flesh with Mr. Knight--appeared to have been, if not a source of pleasure to petitioners, far from its opposite. Overall, we find that this last factor favors respondent.

III.     Conclusion

We conclude that the factors set forth in section 1.183-2(b), Income Tax Regs., are fairly closely balanced in this case. Three factors strongly favor petitioners; three factors strongly favor respondent; two factors slightly favor petitioners; and one factor is neutral. Overall, the preponderance of the evidence convinces us that petitioners' predominant, primary, or principal objective in engaging in their thoroughbred activity was to realize an economic profit independent of tax savings. See Wolf v. Commissioner, 4 F.3d at 713. We base this conclusion on a qualitative judgment, not just on a toting up of factors. Central to our conclusion is Mr. Knight's involvement, not only as the trainer, but also as the coowner of petitioners' horses. In a very real sense, he and petitioners embarked on a joint venture to own, train, race, and sell thoroughbred horses. The evidence clearly established that Mr. Knight embarked on this venture with the

[*35] intent to make a profit.  We conclude that petitioners' motivation was the same as his.

On the basis of the foregoing,

<u>Decision will be entered for</u>

<u>petitioners</u>.